UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | **MEMORANDUM & ORDER** |
| -against- | **20-CR-306 (NGG)** |
| CHRISTOPER CHIERCHIO, JASON KURLAND, FRANGESCO RUSSO, and FRANCIS SMOOKLER, | |
| Defendants. | |

NICHOLAS G. GARAUFIS, United States District Judge.

The pre-trial motions in this case principally involve severance and suppression motions by Christopher Chierchio and Jason Kurland. Kurland also moves to reverse a civil and criminal forfeiture of certain of his assets, and requests orders related to discovery, *Brady*, and a bill of particulars. Frangesco Russo did not file any motions. Francis Smookler pleaded guilty in March 2021 pursuant to a written agreement.

## I.   FACTUAL BACKGROUND

The court assumes general familiarity with the government's theory of this case. As described in the government's indictment and detention memo, co-defendants Christopher Chierchio, Jason Kurland, Frangesco Russo, and Francis Smookler are alleged to have conspired to defraud various lottery winners of their winnings by steering them into sham investments or simply stealing their money for themselves, and then seeking to cover up the thefts by laundering the proceeds. (*See generally* Indictment (Dkt. 1); Detention Mem. (Dkt. 9).) In all, Kurland's clients are alleged to have lost at least $80 million.

The government charged all four defendants with conspiracy to commit wire fraud, wire fraud, conspiracy to commit money laundering, and money laundering. Kurland is charged with honest services wire fraud. As part of a "street loan" they extended

1

to a third-party, Russo and Smookler are also charged with conspiracy to commit extortionate extension of credit, extortionate extension of credit, conspiracy to commit extortionate collection of credit, and extortionate collection of credit.

## II. SEVERANCE

Chierchio moves to sever the extortion-related charges, Counts Eighteen through Twenty-One, as misjoined under Federal Rules of Criminal Procedure Rule 8. He and Kurland each also move to sever their trials from their co-defendants under Rule 14.

### A. Legal Standard

Joinder is permitted by Rule 8 for reasons of judicial efficiency, consistency of verdicts, witness and government convenience, and speedy trials. *See Zafiro v. United States*, 506 U.S. 534, 537 (1993). There is "a preference in the federal system for joint trials of defendants who are indicted together."[1] *Id.* But joinder risks prejudice to defendants where the jury may be unable to make a reliable judgment as to guilt or innocence, or it compromises "a specific trial right of one of the defendants." *Id.* at 539. Accordingly, a district court is required to grant severance if it concludes there has been misjoinder under Rule 8, and it may also do so as a discretionary matter under Rule 14 even if joinder was proper.

Rule 8(a) permits the government to join multiple offenses against a defendant in the same indictment; Rule 8(b) provides that an "indictment or information may charge [two] or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Where multiple charges are brought against multiple defendants, the more restrictive standard of Rule 8(b), rather than the looser one

---

[1] When quoting cases, unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

set forth in Rule 8(a), applies. *United States v. Turoff*, 853 F.2d 1037, 1042-43 (2d Cir. 1988). No prejudice need be shown to allege misjoinder under Rule 8. *United States v. Feyrer*, 333 F.3d 110, 113 (2d Cir. 2003).

Rule 14, on the other hand, requires the court to balance several factors to consider whether the risk of prejudice to a defendant is outweighed by the judicial economy of joinder. Those factors include, but are not limited to: "(i) the number of defendants and counts; (ii) the complexity of the indictment; (iii) the estimated length of trial; (iv) disparities in the amount or type of proof offered against the defendants; (v) disparities in the degrees of involvement by defendants in the overall scheme; (vi) possible conflict between defense theories or strategies; (vii) potential prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant; and (viii) potential prejudice if exculpatory evidence were unavailable in a joint trial, but would have been available to a defendant tried alone." *United States v. Guillen-Rivas*, 950 F. Supp. 2d 446, 457 (E.D.N.Y. 2013). Because severance is an "extreme remedy," *United States v. Lopez*, No. 18-cr-736, 2019 WL 4733603, at *4 (S.D.N.Y. Sept. 27, 2019), the burden is on the defendant to demonstrate its necessity, *see Zafiro*, 506 U.S. at 541. Severance is to be avoided where the court may reduce the risk of prejudice through other "less drastic measures, [like] limiting instructions." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998).

### B. Discussion

#### 1. Misjoinder Under Rule 8(b)

The government has charged two separate schemes in this case: the first (Counts One through Seventeen, the "lottery counts") charges all four defendants with the core lottery fraud of Kurland's clients, and associated money laundering; the second

(Counts Eighteen through Twenty-One, the "extortion counts") charges only Russo and Smookler with a plan to "extend and collect . . . a 'street loan'" to a man named Gregory Altieri.[2] (Gov't. Opp'n (Dkt. 127) at 9-10.)

The Second Circuit's gloss on Rule 8(b) permits joinder where the offenses of multiple defendants are "unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." *Feyrer*, 333 F.3d at 114. In this case, the government's justification for charging the two schemes in a single indictment turns on one sentence of analysis: that Russo, Smookler, and Altieri were involved in each scheme during overlapping periods, and a "common plan" consisted of "a plan by defendants Russo and Smookler to criminally enrich themselves through the same person, Altieri – in the first scheme, by investing the Lottery Victims' funds with him and, in the second, by extending him a street loan under usurious terms." (Gov't. Opp'n at 10.) Chierchio makes no argument that any of the substantive counts in the indictment are insufficiently related to the conspiracy counts to which they are connected. Nor is there an argument that the wire fraud conspiracy (Count One) is insufficiently related to the money laundering conspiracy (Count Sixteen). The question is how the extortion conspiracies (Counts Eighteen and Twenty) and their underlying substantive counts (Counts Nineteen and Twenty-One) relate to everything else.

---

[2] Altieri separately pleaded guilty to a count of wire fraud before Judge Brian M. Cogan on December 30, 2020, and is awaiting sentencing. *See United States v. Altieri*, 20-cr-00249 (BMC) (E.D.N.Y.). Altieri's fraud consisted of a jewelry business Ponzi scheme in which some of the lottery victims were invested. The government alleges he also took out a $250,000 "street loan" from Russo and Smookler.

a.   *Substantial Identify of Facts or Participants*

The first *Feyrer* standard – whether there is a "substantial identity of facts or participants" – instructs courts to ask whether a "reasonable person would easily recognize the common factual elements" between the charged offenses. 333 F.3d at 114. Joinder is proper where proving two schemes in separate trials would "essentially duplicate the evidence" at each, *id.*, or where "proof of one scheme is indispensable for a full understanding of the other," *Turoff*, 853 F.2d at 1044. Joinder is not proper, however, where "[c]ommission of one of the offenses neither depended on nor necessarily led to the commission of the other," or "proof of the one act neither constituted nor depended upon proof of the other." *United States v. Halper*, 590 F.2d 422, 429 (2d Cir. 1978).

The government must moreover demonstrate "substantial identity" while also observing the general rule – adopted by most circuits and assumed but not decided by the Second Circuit – that joinder must be justified on the face of the indictment. *Rittweger*, 524 F.3d 171, 178 n.3 (2d Cir. 2008) ("[W]e caution that the plain language of Rule 8(b) does not appear to allow for consideration of pre-trial representations not contained in the indictment, just as the language of the Rule does not allow for the consideration of evidence at trial."); *see also* 9 Barbara J. Van Arsdale *et al.*, Fed. Proc., L. Ed. § 22:1064 (2021) (surveying circuits).

In this case, the indictment says nothing at all about the "substantial identity of facts" uniting the two schemes. (*See generally* Indictment.) Counts Eighteen through Twenty-One merely recite the elements of the crimes charged, the dates they were alleged to have been committed, and their alleged participants. (*Id.* at 7-9.)

Even if the court considered the additional information in the government's detailed detention memo (filed five days after the indictment), the government concedes in it that the extortionate

loan "was separate from the investments the co-conspirators made in Altieri's Ponzi scheme with the Lottery Victims' money," and it does not identify any additional factual overlap between the two. (Detention Mem. at 22.) Indeed the alleged conspirators themselves apparently saw none, and said as much on wiretaps:

> As Smookler explained in one call to Altieri, the repayment of the "$100 million you owe" (i.e., the millions of dollars of the Lottery Victims' money, plus the profit the co-conspirators apparently thought they should receive) could be delayed and put on a "shelf," but the "couple of hundred grand that you borrowed [in the street loan], you have to pay that back."

(*Id.*) In other words: there was something that so fundamentally distinguished the two schemes that Russo and Smookler were willing to delay the repayment of the lottery losses, but not the street loan, even though the first were four hundred times larger than the second. It is not immediately clear why; but the disjunction illustrates why no Rule 8 value is served by joinder of these two schemes: the government does not have overlapping facts to prove. *See United States v. Butler*, No. 04-cr-340 (GEL), 2004 WL 2274751, at *4 (S.D.N.Y. Oct. 7, 2004) (permitting joinder where "proof of the very same facts is necessary to establish each of the joined offenses"). Far from it. The sources of the money involved were different. Their beneficiaries were different. The victims were different. The purposes to which the funds were put were different. Their methods of generating profits rested on different logic. There is no allegation that Altieri accepted the street loan in order to pay off any part of the Ponzi losses, nor that he used any of the Ponzi funds to pay off the street loan. Nor would explaining to a jury how a Ponzi scheme works do anything to also explain how loan-sharking works. Apart from three participants (one of whom was not charged in the indictment and one

of whom will not appear before the jury because he pleaded guilty), each scheme apparently had no relationship to the other, let alone "depended upon [or] necessarily led to the commission of the other." *Halper*, 590 F.2d at 429.

### b.  Common Plan or Scheme

It is possible, alternatively, that two schemes with little factual overlap could nonetheless be joined if they each "[arose] out of a common plan scheme" – the second *Feyrer* elaboration of Rule 8(b). 333 F.3d at 114. But the government has not demonstrated that either.

As a threshold matter, the mere fact that all defendants are named somewhere in the indictment in the same conspiracy (Counts One and Seventeen, the wire fraud and money laundering conspiracies) is not itself sufficient to end the Rule 8(b) analysis. It could be, if a single conspiracy was charged that encompassed all underlying substantive crimes. *See United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988) ("The established rule is that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b)."). But where an indictment charges multiple conspiracies, the government must show how "one scheme stemmed from the other." *Turoff*, 853 F.2d at 1044; *see also, e.g.*, *United States v. Lech*, 161 F.R.D. 255, 255 (S.D.N.Y. 1995) (misjoinder even though indictment alleging multiple conspiracies alleged one in which all defendants participated).

In *Turoff*, the Second Circuit upheld the joinder of two conspiracies even though the funds involved in each conspiracy "were not derived directly from the [other]." 853 F.2d at 1044. Though the *Feyrer* standards had not yet been articulated, the court concluded in essence that under the first *Feyrer* standard, the "identity of funds" could not suffice to establish a "substantial identity of facts," but that, under the second, the two schemes nonetheless could be joined as part of a "common plan or

scheme." *See id.* The "key link," the panel wrote, was that "one scheme stemmed from the other" such that the benefits of one scheme "were part and parcel" of the other. *Id.* "[A]pplying a commonsense rule," the court held that the same acts "simultaneously [] advance[d]" both schemes and had "more than a temporal and spatial relationship." *Id.*

There is no reason to conclude that the two schemes charged in this case are united by such a common plan. One scheme did not beget the other. The funds derived from one were not put to use in the other. *See, e.g.*, *United States v. Ohle*, 678 F. Supp. 2d 215, 225 (S.D.N.Y. 2010). Indeed, it is conceivable even that the two schemes could have been antagonistic to each other: in the first, Altieri is an apparent partner of Russo and Smookler in stealing the lottery victims' money. In the second, Altieri is Russo and Smookler's apparent loan-sharking prey and the victim of violent threats against his family, rendering any recovery of the lottery losses less likely by virtue of the extortion. *See, e.g.*, *United States v. Rojas*, No. 01-cr-257 (AGS), 2001 WL 1568786, at *5-6 (S.D.N.Y. Dec. 7, 2001) (finding no common purpose where the goals of two schemes were antagonistic). Nor is there any allegation that each of the lottery co-conspirators were even aware of the extortion scheme. *See Ohle*, 678 F. Supp. 2d 215, 225 (conceding that such knowledge is not required for joinder, but that "it is an indicator of whether or not there is a common scheme or purpose").[3] Without more, it is impossible to say that one scheme advanced or "stemmed from the other."

---

[3] In its detention memo, the government speculates that there "are recorded calls that indicate Kurland was aware" of the extortion scheme. (Detention Mem. at 22 n.19.) But the conversation the government cites refers to discussion of a sum of money so large ($50 million) that it could only have been referring to the lottery investments, not the street loan (only $250,000).

The government's response that a "common plan" consisted of "a plan by defendants Russo and Smookler to criminally enrich themselves through the same person, Altieri" is not persuasive. (Gov't. Opp'n at 10.) It merely reiterates that two schemes existed and shared some common participants. That more closely resembles the Rule 8(a) standard, rather than 8(b). *See Lech*, 161 F.R.D. at 256 ("It is well settled, however, that two separate transactions do not constitute a 'series' within the meaning of Rule 8(b) 'merely because they are of a similar character or involve one or more common participants.'"). And identifying "criminally enrich[ing] themselves" as a shared purpose is to embrace a level of generality barely a step removed from "committing crime." Such vague plans cannot justify joinder. *See, e.g.*, *United States v. Shellef*, 507 F.3d 82, 99 (2d Cir. 2007) (misjoinder where the same business involved in the sale of the same product was the only link between two schemes); *United States v. Yaron*, No. 10-cr-363 (GBD), 2011 WL 3279054, at *1-2 (S.D.N.Y. July 28, 2011) (misjoinder where only common links were the defendants and their desire for kickbacks); *United States v. Rajaratnam*, 753 F. Supp. 2d 299, 311 (S.D.N.Y. 2010) (misjoinder where indictment's "allegations amount[ed] to little more than that both defendants separately conspired to commit the same offense"); *United States v. Greenfield*, No. 01-cr-401 (AGS), 2001 WL 1230538, at *3 (S.D.N.Y. Oct. 16, 2001) (misjoinder where the only common purpose was a desire to commit insurance fraud); *Lech*, 161 F.R.D. at 257 (misjoinder where there was no "specific knowledge," "joint[] participat[ion]," or "springboard" between two conspiracies); *see also Rittweger*, 524 F.3d at 178 (acknowledging that while charging an overarching conspiracy is not necessary, "a common purpose and . . . overlap of participants and acts" among multiple conspiracies is).

    *c.*   *Conclusion*

Because the court concludes that the government has failed to satisfy Rule 8(b) under either *Feyrer* standard, neither on the face

of the indictment nor in its other submissions, Chierchio's motion to sever the extortion counts from the indictment is GRANTED.

### 2.  Severance Under Rule 14

Chierchio further moves under Rule 14 to sever his trial from his co-defendants Kurland and Russo. He argues primarily that he would suffer prejudice by being tried jointly with Russo, because Russo is charged with violent crimes and he is not.

Kurland similarly argues that prudential severance should be granted because (1) the defendants will present mutually antagonistic defenses, arguing that each was a defrauded dupe of the others (citing principally the *Nordlicht*, *Aronson*, and *Shkreli* cases); (2) disparities in proof and culpability will create substantial prejudice; (3) there is a risk of "spillover" prejudice as the result of evidentiary admissions that would not be granted in separate trials; (4) judicial efficiency will be better served; (5) speedy trial rights would be otherwise compromised; and (6) limiting instructions will not adequately cure the risk of prejudice.

Kurland contends, in essence, that his co-defendants lied to him about the investments he believed they were managing. The wiretaps, he says, show that in their conversations without him, Russo, Smookler, and Chierchio treat Kurland as every bit the sucker as the lottery winners themselves. In his motion papers, Kurland argues that he "anticipate[s] that Mr. Kurland's co-defendants will present exactly contradictory defenses – namely, that *they* were honest businessmen whose deals went south, and that they deceived neither Mr. Kurland nor his clients." (Kurland Mot. (Dkt. 119) at 24.) The government argues in response that there is nothing inconsistent about Kurland being a full participant in the fraud on one hand, while simultaneously also being manipulated and perhaps defrauded by his co-defendants on the other (and vice versa). (*See* Gov't. Opp'n at 12-13.)

### a.   Mutually Antagonistic Defenses

The Supreme Court has held that even mutually exclusive antagonistic defenses, in which the jury *must necessarily* disbelieve one defendant's story in order to believe another, do not require severance as a "bright line rule." *Zafiro*, 506 U.S. at 538. *Zafiro* effectively overruled Second Circuit precedent that had previously taken a stricter approach to severance. *See, e.g.*, *United States v. Serpoosh*, 919 F.2d 835 (2d Cir. 1990). Since, the Second Circuit has permitted joinder even in extreme cases of mutual antagonism. *See, e.g.*, *United States v. Harwood*, 998 F.2d 91, 95-96 (2d Cir. 1993) (affirming denial of severance where both defendants claimed the other hid LSD in a van, such that the jury could not believe one without disbelieving the other).

Here, the risk is not in such stark (mutually exclusive) antagonism, but rather more garden-variety conflict. All defendants *could* simultaneously be guilty of fraud, of both each other and the lottery victims, at the same time. Although other courts have ordered severance in such modestly antagonistic situations, the showing of prejudice must necessarily be stronger, or the evidence of effectiveness of curative limiting instructions weaker.

Kurland points primarily to three cases in arguing for severance: *United States v. Nordlicht*, No. 16-cr-640 (BMC), 2018 WL 1796542; *United States v. Shkreli*, 260 F. Supp. 3d 247 (E.D.N.Y. 2017); and Mem. of Decision and Order, *United States v. Aronson*, No. 12-cr-245 (ADS) (E.D.N.Y. May 23, 2013) (Dkt. 167). But the court is not persuaded that those decisions control here.

*Nordlicht*, first, is distinguishable. It involved multiple defendants (Nordlicht primary among them) claiming that the frauds the government charged simply were not frauds, and one co-defendant (Shulse) claiming that they were, but that he was not involved in perpetuating them. Shulse's defense therefore repeated many of the government's arguments against the others; indeed, he argued that he was something of a whistleblower,

having reported to the SEC. The trouble arose not just from the fact that Shulse claimed to be "at worst, merely an unknowing pawn in [the] alleged frauds [of his co-defendants]." *Nordlicht*, 2018 WL 1796542 at \*2. It was that Shulse had elected that defense *and* that his co-defendants had elected an entirely different one (that there was no legally cognizable fraud). Severing Shulse from his co-defendants focused the question at the *Nordlicht* trial on a single issue: whether or not the conduct charged was or was not fraudulent. Tried together in this case, however, Kurland, Chierchio, and Russo may simply argue that one or the other was responsible. There are not two issues (the existence of fraud on one hand, and who committed it on the other) that could confuse the jury. There is only one: whodunit.

*Aronson* is, as Kurland rightly points out, a more similar case and a closer call. *Aronson* involved two co-defendants charged in a Ponzi scheme. One defendant, attorney Aaron, claimed that the other, businessman Aronson, "lied to him, deceived him, and made him an unknowing [pawn] in a fraud about which [he] was unaware." Mem. & Order at 12, *Aronson*, No. 12-cr-245. Aronson relied on a different advice of counsel defense that "whatever [he] did, it was approved by attorney Aaron." *Id.* at 13. The court held that believing Aronson's defense necessarily required disbelieving Aaron's, because if Aronson was acting on the advice of his counsel, it would prove that he could not have also had the requisite intent to defraud. *Aronson*, however, should not be taken too far. Despite the court's holding, the case is not a strong example of mutual antagonism. Although accepting one defense may have gone some distance to preclude the other, reliance on advice of counsel is not a complete, affirmative defense; it merely tends to negate the element of intent:

> In a fraud case, however, the advice-of-counsel defense is not an affirmative defense that defeats liability even if the jury accepts the government's allegations as true.

> Rather, the claimed advice of counsel is evidence that, if
> believed, can raise a reasonable doubt in the minds of
> the jurors about whether the government has proved the
> required element of the offense that the defendant had
> an "unlawful intent."

*United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017). A jury therefore likely *could* have believed parts of both Aaron's and Aronson's stories.

Recognizing that point, *Shkreli*, in contrast to *Aronson*, reasoned on very similar facts (where one defendant claimed his co-defendant lied to him, and the other claimed reliance on the advice of his co-defendant counsel) that mutual antagonism was not doctrinally satisfied. *See Shkreli*, 260 F. Supp. 3d at 254. The court nonetheless held, however, that severance was still justified for a closely related reason: that the risk of one defendant's "double prosecution," at the hands of both the government and a co-defendant, undermined Shkreli's right to a fair trial. But, as in the *Nordlicht* case, the court's reasoning emphasized that one defendant's theory intended to argue that "no crime was committed" at all for reasons that were distinct from who committed it. *Id.* at 257. The jury would thus have to determine first whether there was fraud, and second who was culpable, creating a risk of confusing issues. The co-defendants in this case propose, by contrast, to each acknowledge that fraud occurred, but pin it on the other – which looks more like the common finger-pointing that inheres in nearly any multi-defendant trial.

Given the differences between this case and *Nordlicht*, *Shkreli*, and *Aronson*, the court concludes that the possibility of mutual antagonism does not favor severance. Despite these differences, severance could still be appropriate if the court was persuaded that other potential sources of prejudice would be especially severe. But the remaining severance factors present even less compelling reasons to justify it.

### b.   Disparities in Proof

First, Kurland argues that the proof against him is weaker than his co-defendants. He argues that his co-defendants lied to him; that he was not involved in the day-to-day operations of the investments he facilitated for his clients; and that the financial transfers the government points to as evidence of fraud were actually carefully negotiated contractual agreements. (*See* Kurland Mot. at 20.)

It is surely true that the evidence against Kurland is in some sense weaker than against his co-defendants – if only because Kurland did not openly discuss the FBI's investigation on wiretaps, as Russo, Smookler, and (to a lesser extent) Chierchio appear to have done. But this factor requires an especially dramatic disparity given the necessarily differing levels of culpability in any multi-defendant trial. *See United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991) ("disparity in the quantity of evidence and of proof of culpability are inevitable in any multidefendant trial, and by themselves do not warrant a severance"). Given the apparently admissible evidence of Kurland's involvement the government has adduced thus far, the court is not prepared to conclude that such a disparity exists in this case – and certainly not one so disproportionate as to conclude that a joint trial would generate "prejudice so substantial as to amount to a miscarriage of justice." *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988).

### c.   Spillover Prejudice

Kurland claims that, in a joint trial, there is evidence "potentially admissible against other defendants that is not admissible against [him]," pointing to his co-defendants' (1) criminal and Mafia history and (2) threats of extortion against Altieri. (Kurland Mot. at 29-32.) Chierchio makes much the same argument. (Chierchio Mot. (Dkt. 117) at 6-7.) Kurland also claims that his co-defendants would be prejudiced by evidence he would seek to admit

against them in a joint trial that the government would not seek to admit in separate trials (*i.e.*, evidence which proves Kurland was their dupe, rather than partner in crime). (Kurland Mot. at 31-32.)

For two reasons, the court is not convinced that these admissions would create an unacceptable risk of "spillover prejudice."

First, Kurland must demonstrate not simply that some different evidence may come in, or not come in, depending on whether there is a joint trial. He must show that evidence would be admitted that would otherwise be inadmissible, or excluded that would otherwise be admissible. And he has simply not explained how this could happen; indeed, if evidence of Chierchio and Russo's criminal histories or Mafia ties was admissible under Rule 404(b), it is hard to see why it would be admitted at a joint trial but not at separate trials. And the evidence Kurland claims he would introduce at a joint trial that the government would "ha[ve] no interest" in admitting in separate trials is not evidence that would otherwise be inadmissible; it is, by Kurland's own lights, admissible evidence that simply may or may not be introduced depending on the government's strategic choices. (*See* Kurland Mot. 31-32.)

Second, having now severed the extortion counts, the likelihood of prejudice stemming from Russo and Smookler's violent threats against Altieri is also reduced. *Cf. Cardascia*, 951 F.2d at 483 ("Relief by severance may be more appropriate when the unrelated evidence reflects activities of a violent nature because the risk of substantial prejudice is greater."). Kurland argues that severance of these counts does not cure the possibility for prejudice because he "likely would seek to introduce evidence related to Russo and Smookler's alleged extortion in any event," in an effort to pin blame more fully on his co-defendants. (*Id.* at 32 n.16.) That is his strategic choice to make. Any resulting prejudice arises from that choice and, ultimately, his decision to do business with

Russo and Smookler – *not* because he has been forced into a joint, rather than individual, trial.

### d.  Judicial Efficiency

Kurland next argues that the problems described so far are so severe that he will be forced to make repeated, disruptive objections that will slow the trial. He also contends that separate trials are justified for COVID-19 social distancing reasons.

The court is simply not persuaded, given its long history of trying complex and multi-defendant cases, that it cannot effectively dispatch with whatever evidentiary issues may arise at trial (or before, in further motion practice). And although public health conditions continue to present challenges, the court has already scheduled two trials sooner than this one that involve greater numbers of defendants than in this case. *See* Nov. 10, 2021 Min. Entry, *United States v. Hytmiah et al.*, No. 18-cr-33 (E.D.N.Y. Nov. 10, 2021). If circumstances change, the court can revisit the issue in the future.

### e.  Speedy Trial

Kurland also argues that he is prepared to go to trial as soon as possible, and that to the extent his co-defendants might argue for further delay, his speedy trial rights will be impaired. There is no indication, however, that Kurland's co-defendants (one of whom, unlike Kurland, is detained pre-trial) actually have sought or will seek delays he opposes. The July trial date that has been set in this case reflects the unfortunate reality amid the pandemic of an "alarmingly oversized backlog of trial-ready cases." *United States v. Elias*, No. 18-cr-33 (S-2) (NGG), 2022 WL 125721, at *3 (E.D.N.Y. Jan. 13, 2022). As a practical matter, severance is more likely to create additional delays rather than alleviate them. To the extent that Kurland objects on Speedy Trial Act grounds, he is welcome to litigate the matter. As a severance factor, however, the court concludes that the balance of equities favor a joint trial.

### f.   Limiting Instructions

Combining essentially all of the above, Kurland finally argues that limiting instructions will be ineffective in curing the various sources of alleged prejudice. Substantially for the reasons already discussed, and especially because the extortion counts have now been severed, the court is confident such instructions would be effective.

To the extent that a joint trial produces some level of prejudice against any defendant, the court will consider appropriate limiting instructions the parties may later propose at trial and in their jury charges.

### g.   Conclusion

In summary, the court concludes that none of the *Guillen-Rivas* factors cited by Kurland or Chierchio favor discretionary severance. Their motions to sever are therefore DENIED.

## III.  SUPPRESSION MOTIONS

Chierchio moves to suppress all evidence obtained from the search of his apartment. Kurland moves (1) to suppress the evidence obtained from the search of his cell phone; (2) for a *Franks* hearing related to that search; and (3) for the return of his cell phone pursuant to Rule 41(g).

### A.   Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. A "seizure" of property "occurs for purposes of the Fourth Amendment if the police meaningfully interfere with an individual's possessory interests in that property." *United States v. Smith*, 967 F.3d 198, 205 (2d Cir. 2020).

"It is a basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable. . . . [But] the warrant requirement is subject to certain reasonable exceptions." *Kentucky v. King*, 563 U.S. 452, 459 (2011). Among the exceptions, the plain-view doctrine permits warrantless seizures when the police "encounter[] incriminating evidence" and its incriminating nature is "immediately apparent," as long as they have a "legitimate reason" for conducting the search. *United States v. Babilonia*, 854 F.3d 163, 180 (2d Cir. 2017). Another exception is for searches and seizures incident to arrest, which "permits the police to search a lawfully arrested person and areas within his immediate control," *Smith v. Ohio*, 494 U.S. 541, 543 (1990), and seize evidence obtained from such searches, *Utah v. Strieff*, 579 U.S. 232, 243 (2016).

Probable cause is "a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

### B.   Discussion

#### 1.   The Search of Chierchio's Apartment

Chierchio argues that the fruits of the government's search of his apartment should be suppressed because the FBI's affidavit supporting its warrant application did not establish probable cause. He casts as speculative the claim that participants in organized crime "often maintain in their residences . . . evidence" of their crimes; that Chierchio's alleged use of electronic devices in his crimes is not specific enough to create probable cause; and that the affiant agent did not disclose to the Magistrate Judge that the checks Chierchio cashed could have been explained by other ordinary business transactions. (*See* Chierchio Mot. at 9-10.)

The government responds that the affidavit supporting the warrant described the crimes with which Chierchio had been charged; detailed a number of suspicious funds transfers he made; and included excerpts of wiretaps in which Chierchio discussed the alleged scheme. (*See* Gov't. Opp'n at 20-22.) It further argues that even if the court found the search was conducted without probable cause, the agents still relied on the warrant in good faith and therefore the good faith exception would defeat suppression. (*Id.* at 23-25.)

The court agrees with the government that sufficient cause existed to search the apartment. Probable cause is a test that depends on the totality of the circumstances. *See Gates*, 462 U.S. at 230. Here, those circumstances include incriminatory statements made on judicially approved wiretaps of Chierchio's phone, and the fact that the phone – containing information that may have been evidence of crimes, and identified in the warrant as among the property to be seized – was likely to be found at Chierchio's home. (*See* Gov't. Opp'n Ex. A (Dkt. 128-2) Attachment A-4 at 6.) The affidavit supporting the warrant also reasonably argued it was probable there would be bank records related to the alleged fraud in all of the searched premises, including Chierchio's home. (*See id.* at 74.) It is also probable that, as the government suggests, Chierchio's large cash withdrawals could indicate the presence of large amounts of cash at his home. Even if other explanations could equally explain the withdrawals, the government's substantial evidence of financial impropriety, subpoenaed from the banks at which the transfers were made, is still enough to satisfy probable cause.

Because these allegations suffice to establish probable cause, the court need not further scrutinize the additional allegations related to Chierchio's purported ties to organized crime. It also need not address the government's alternative argument rooted in the good faith exception.

Chierchio's motion to suppress is DENIED.

### 2. The Seizure and Search of Kurland's Phone

Kurland seeks to suppress any evidence from the search of his cell phone as the poisonous fruit of an illegal seizure. According to Kurland, FBI agents told him at the time of his arrest that he could only call his lawyer and family if he brought his phone with him to booking; when he did so, the government seized it.[4] The government accepts Kurland's version of events *arguendo*. Eight days after Kurland's arrest, Magistrate Judge Robert M. Levy approved a warrant to search the phone.

Kurland argues that the implicit threat he would be unable to contact his lawyer violated his Sixth Amendment right to counsel and constituted coercive bad faith, *i.e.*, a way for the agents to seize the phone either without having to seek a warrant or because they lacked probable cause to secure one. Because of this bad faith, Kurland argues, suppression of the subsequent fruits of the search of the phone is justified.[5] The government argues that the circumstances of the seizure were simple misunderstandings, and concedes that the agents were incorrect to advise Kurland he would have to bring his phone with him in order to contact his lawyers, but that the agents did not act in bad faith. Even if the seizure was unlawful – the government contends to the contrary that it was lawful, pursuant to either the plain view exception or as a seizure incident to arrest – the good faith exception would still apply.

---

[4] Kurland was arrested at his home pursuant to an arrest warrant, but the government never searched his house, then or later. Nor did the government ever wiretap any of Kurland's phones, and it did not seek the seizure of Kurland's phone as part of the arrest warrant.

[5] If there are any fruits: the government has not completed its review of the device nor turned over any of its contents in discovery.

### a.   The Plain View Exception

The government argues first that the agents "were entitled to seize the Kurland Phone, which was located in their plain view, in order to secure it until the time they could obtain a search warrant." (Gov't. Opp'n at 27.) "The plain view exception," the government argues, "authorizes seizure not only of apparent contraband, but also of mobile phones or other everyday items where officers have probable cause to believe they may contain evidence of a crime." (*Id.* at 28.) Kurland responds that "[t]o find the Phone's incriminating character was immediately apparent would be to endorse an unjustifiably broad construction of the plain view doctrine." (Kurland Mot. at 45.)

Broad or not, the Second Circuit has held that the temporary seizure of electronic devices "is justified where the officers have probable cause to believe that [they] contain or constitute evidence" so long as the government does not search a device "until after a warrant [has] been obtained." *Babilonia*, 854 F.3d at 180; *Smith*, 967 F.3d at 209 (imposing the additional requirement that such a warrant must be obtained without unreasonable delay). The Supreme Court has similarly allowed temporary warrantless seizures of evidence in other contexts, repeating "reasonableness" as the Fourth Amendment's ultimate touchstone. *See Illinois v. McArthur*, 531 U.S. 326, 334 (2001) ("We have found no case in which this Court has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time."); *United States v. Place*, 462 U.S. 696, 702 (1983) (upholding a temporary seizure of luggage with only reasonable suspicion, where the seizure was minimally invasive).

Kurland objects that such a rule permits the police to dispense with the warrant requirement for the seizure of the phone of

most any arrestee – indeed, perhaps all of their electronic devices, and if they are arrested at home, all of their family members' devices too whenever it is not immediately clear whose is whose. Given the ubiquity of phones in our lives, Kurland argues it will almost always be the case that where there exists probable cause to arrest someone, there will also be probable cause to think evidence of the crime may be found on their phone. He is not the first to raise a concern of this kind. *See, e.g.,* *United States v. Griffith*, 867 F.3d 1265, 1275 (D.C. Cir. 2017) (objecting that the government's reasoning implied that "because nearly everyone now carries a cell phone, and because a phone frequently contains all sorts of information about the owner's daily activities, a person's suspected involvement in a crime ordinarily justifies searching her home for any cell phones").

*Babilonia*, however, addressed precisely that argument and rejected it. *See* 854 F.3d at 180 ("[The defendant] argues that the ubiquity of cell phones and the fact that he was arrested in his home preclude a finding that the incriminating character of the phones and tablet was immediately apparent. We disagree."). Without announcing any rule that generally permitted such warrantless seizures, the Second Circuit held that the facts of that case permitted the FBI to seize devices in "plain view" where the government had already been "investigating [the defendant] for months" and had gathered evidence showing that the conspiracies for which the defendant was arrested "involved the use of multiple cell phones"; "[a] separate wiretap investigation . . . showed that [the defendant] and his co-conspirators used cell phones to conduct" the charged crimes; analysis of the phones had been conducted "in connection with [the] purported criminal activity"; and the FBI agent's experience showed how "address books usually contained contact information for associates" on phones. *Id.*

Nearly every one of those sentences could have been written to describe this case: at the time of the seizure, the government's investigation had persisted for months; multiple cell phones were involved in the conspiracies charged; wiretaps had suggested the defendant and his co-conspirators were using their phones to advance the conspiracies; and there was reason to believe that additional evidence might be located on the phones. Kurland objects that the government could not have been sure that the phone it saw on his countertop at the time of his arrest was the one it suspected was involved in criminality. (Kurland Mot. at 44-45.) But it did not need certainty – only probable cause. That standard was easily satisfied when agents witnessed Kurland using the phone and identifying it as his.

In a straightforward application of *Babilonia*, the court must conclude that probable cause existed to seize Kurland's phone at the time of his arrest and that the plain view exception permitted the government to seize it. To be sure: simply seeing a device in plain view near an arrestee cannot be sufficient to seize it without knowing much more about the previous potentially criminal uses to which the device has been put. But where, as here, the government has amassed such information, later seeks a warrant for the device's search, and does so without unreasonable delay, the Fourth Amendment is not violated.

       *b.   Seizure Incident to Arrest*

Although the court has already identified a sufficient basis to deny Kurland's suppression motion, it would reach the same conclusion even if only the seizure incident to arrest exception applied.

On that alternative ground, the government argues that the exception applies for the simple reason that Kurland had his phone on his person at the time he was arrested, and the court should not fuss over its precise location or the exact moment of Kurland's arrest. Kurland responds that the phone would not have been on

his person but-for the FBI agents coercing him to bring it with him. Because the seizure was only possible because of the coercion, Kurland argues both that the seizure was illegal and that the application of the exclusionary rule is justified to deter official misconduct. He cites to a variety of cases holding that the police cannot end run the incident to arrest exception by intentionally siccing objects on an arrestee, or moving an arrestee to the vicinity of other objects, to surreptitiously justify their search. (*See* Kurland Mot. at 37.)

Kurland's contentions depend on believing that the agents, knowing they did not have probable cause to seize the phone (or being unwilling to detail it in a warrant), intentionally coerced Kurland to bring his phone with him to booking specifically so as to satisfy the seizure incident to arrest exception. Why the government would need to do so, however, is something of a mystery. The agents already had probable cause to seize Kurland, and the court has concluded that they then also had probable cause to seize his phone. The cases Kurland cites in which police move objects onto an arrestee's person, or move an arrestee to bring objects within his immediate control, provide little insight because the agents would have gotten nothing out of doing so with a phone they already had probable cause to seize. Unlike evidence the police are permitted to search incident to a lawful arrest, like the evidence involved in *Robinson* or *Perea*, 414 U.S. 218, 236 (1973) (defendant's package of cigarettes), 986 F.2d 633, 643 (2d Cir. 1993) (defendant's duffel bag), the government would still have to get a warrant to search a seized phone, *Riley v. California*, 573 U.S. 373, 386 (2014).

The events taken as a whole make it difficult to conclude that the agents acted coercively or in bad faith. Without any direct evidence they did so, Kurland must rely on a chain of speculative inferences that hold only loosely together. Because the court finds no coercion, it cannot conclude either that the seizure was

illegal or that the exclusionary rule should apply. Kurland's motion to suppress is therefore DENIED.

Because the court concludes that the seizure was justified under either the plain view doctrine or as a seizure incident to arrest, it has no occasion to reach the government's alternative argument regarding the good faith exception.

c.   The *Franks* *Hearing Requested by Kurland*

Kurland argues that, even if the seizure of his phone does not violate the Fourth Amendment, it provides the basis for a *Franks* hearing that may justify suppression, because the warrant that Magistrate Judge Levy issued for the search relied on misstatements that were either intentionally false or made in reckless disregard for the truth. Namely: that the phone was seized incident to arrest, rather than under the circumstances Kurland describes as coercive.

There are at least two problems with this argument, apart from the general point that the seizure was not coercive. First, Kurland must show that the agents (a) made a false statement, and (b) did so intentionally or with reckless disregard for the truth. *See Franks v. Delaware*, 438 U.S. 154, 170 (1978). Kurland cannot show either. That the phone was seized incident to arrest is something of a mixed question of fact and law, not one that can easily be described as "false." Without falsity, intentionality does not matter.

Second, even if these elements were satisfied, Kurland would also have to show that the statement was material to the probable cause finding. But at the time Magistrate Judge Levy reviewed the warrant, he was doing so only to determine whether there was probable cause for a search of the phone – any lack of probable cause for the earlier seizure was simply not a part of the forward-looking search analysis. It therefore could not have been material to it.

Kurland's motion for a *Franks* hearing is accordingly DENIED.

### d.  Kurland's Rule 41(g) Motion

Because the court has held that Kurland's phone was seized legally, it should not be returned pursuant to Rule 41(g) until such time as the government's need for the property has ended. *See Ferreira v. United States*, 354 F. Supp. 2d 406, 409 (S.D.N.Y. 2005). At this juncture, the government's search has not been completed, so its need has not yet ended.

Kurland's motion for return of his phone is accordingly DENIED.

### C.  Conclusion

Chierchio and Kurland's suppression motions are DENIED in their entirety; Kurland's request for a *Franks* hearing is DENIED; and Kurland's Rule 41(g) motion for the return of his phone is also DENIED.

## IV.  FORFEITURE OF KURLAND'S LAW FIRM CAPITAL ACCOUNT

Kurland moves for (1) the return of certain assets related to his law firm partnership capital account, worth approximately $250,000; or alternatively (2) a *Monsanto* hearing to establish that there was no probable cause to seize the assets. The court does not believe the former is appropriate without the latter, and so it DENIES Kurland's motion for the return of the seized funds.[6]

---

[6] The bases Kurland cites for the immediate return of the funds are now largely moot, because they were premised on his understanding at the time that the funds were seized without a warrant. (*See generally* Kurland Mot. at 63-73.) That misunderstanding was the result of the government's failure to disclose either the warrant for Kurland's capital account or the preliminary order of forfeiture entered in conjunction with Francis Smookler's guilty plea. Kurland concedes that the government's subsequent disclosures "likely mooted [his] statutory argument." (*See* February 18, 2022 Letter from Telemachus P. Kasulis (Dkt. 146.).) The court agrees.

As to Kurland's alternative motion, the court previously issued an order denying, without prejudice, his request for a *Monsanto* hearing, citing *United States v. Bonventre*, 720 F.3d 126, 131 (2d Cir. 2013). (*See* Feb. 1, 2022 Order.) In that order, the court directed Kurland to "submit, *ex parte*, an affidavit to the court further detailing" certain aspects of his financial condition if he wished to renew his application. (*Id.*) The government objected to the court's order, arguing that the affidavit should be sealed but still shared with it, rather than reviewed *in camera*. (*See* February 17, 2022 Letter from the Government (Dkt. 145.).) The court directed Kurland to hold any affidavit in abeyance while the court considers the issue. (*See* Feb. 18, 2022 Order.)

Given the ongoing dispute, the court RESERVES judgment on Kurland's request for a *Monsanto* hearing.

## V. OTHER MOTIONS

### A. Rule 16 Discovery

Kurland moves to compel production of any remaining Rule 16 material within 30 days, citing prior instances in which the government belatedly made disclosures. The government contends that these issues are now largely moot because, as of November 3, 2021, "the Government completed its production of responsive materials to the defendants," with the exception of the two unanalyzed devices (including Kurland's phone). (Gov't. Opp'n at 38.) At oral argument, Kurland all but conceded that the issue is now moot. (Jan. 4, 2022 Oral Argument Tr. at 44.) Kurland's motion for such an order is therefore DENIED at this time.

### B. *Brady* Material

Kurland also asks the court to issue an order compelling the early production of all witness statements, arguing that the government has shown itself unable or unwilling to identify and produce *Brady* material.

The court held a status conference on this issue on February 10, 2022. At that conference, the court ordered "the government to turn over all remaining undisclosed witness statements to the defense by April 15, 2022, and to promptly disclose any statements from interviews conducted thereafter." (February 10, 2022 Minute Entry.) That order substantially resolves Kurland's *Brady* motion by providing for nearly total disclosure, almost three months ahead of the currently scheduled trial date of July 11, 2022 – ample time for Kurland to make use of the material. *Cf. Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) ("It is not feasible or desirable to specify the extent or timing of [the] disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's opportunity to use the evidence when disclosure is made."). The court therefore DENIES Kurland's motion as moot. He may, of course, raise additional *Brady* concerns in the future if they arise.

### C. Bill of Particulars

Kurland finally moves for a bill of particulars on the money laundering charges against him, contending that he is unable to determine which transactions to and from his GK3 LLC, "among dozens or possibly hundreds of transactions involving Mr. Kurland," are those that the government believes are evidence of money laundering. (Kurland Reply at 21.)

#### 1. Legal Standard

Rule 7 permits defendants to request a bill of particulars "to prepare for trial [and] to prevent surprise," Fed. R. Crim. P. 7(f), but the decision whether to order the filing of a bill of particulars is one which rests within the discretion of the court, *see United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998). A bill of particulars must be granted "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*,

194 F.3d 37, 47 (2d Cir. 1999). The test is "not whether the information sought would be helpful to the defense, but whether it is necessary." *United States v. Batista*, No. 06-cr-265 (DLI), 2009 WL 910357, at *9 (E.D.N.Y. March 31, 2009).

 2.  Discussion

Evidence of money laundering in this case is apparently to be primarily deduced from bank records that indicate various transfers to and from certain investment entities. Kurland argues that, because he did not commit money laundering, he cannot be sure which transfers the government believes are evidence of the crimes. Nor can he meaningfully narrow them down because the government has not provided a list of unindicted co-conspirators who may have been counterparties to the transactions. The government argues that it has already provided, in its detention memo, three examples of transactions it believes to be laundering activity. (*See* Detention Mem. at 5.)

The Second Circuit has demonstrated special sensitivity to requests for bills of particulars in complex cases. *See, e.g.*, *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) ("The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel who were left unguided . . . ."). So too has this court, requiring in a recent securities fraud case (while formally denying the defendant's request for a bill) that the government disclose "identities of unindicted co-conspirators and provide a final, binding list of all trades alleged" to be crimes ahead of trial to prevent surprise to the defense. *United States v. Johnson*, No. 16-cr-457-1 (NGG), 2017 WL 11490480, at *4 (E.D.N.Y. May 24, 2017); *cf. United States v. Gasperini*, No. 16-cr-441 (NGG), 2017 WL 2399693, at *12 (E.D.N.Y. June 1, 2017) (denying a bill, but because the government had "already provided Defendant with the transactions alleged to constitute money laundering").

The court concludes that the government should identify the transactions alleged to constitute money laundering in this case, but sees no reason why a bill should include the names of unindicted co-conspirators. Kurland's motion for a bill of particulars is GRANTED to that extent, and the government is ORDERED to provide one no fewer than thirty days before trial.

### D. Conclusion

In summary, Kurland's motion to order the completion of Rule 16 discovery is DENIED as moot; his motion for a *Brady* order is DENIED as moot; and his request for a bill of particulars is GRANTED as to the transactions but not as to the identities of co-conspirators.

## VI. CONCLUSION

Chierchio's motion to sever Counts Eighteen through Twenty-One from the indictment under Rule 8 is GRANTED. Chierchio and Kurland's motions for severance under Rule 14 are DENIED. Chierchio and Kurland's motions for suppression are DENIED; Kurland's motion for a *Franks* hearing is DENIED; and his motion for a Rule 41(g) motion for the return of his phone is DENIED. Kurland's motion for the immediate return of his capital account funds is DENIED; his motion for a *Monsanto* hearing is RESERVED. Kurland's motion to order the completion of Rule 16 discovery is DENIED as moot; his motion for a *Brady* order is DENIED as moot; and his request for a bill of particulars is GRANTED in part.

SO ORDERED.

Dated:      Brooklyn, New York
            February 22, 2022

                                   s/Nicholas G. Garaufis

                                   NICHOLAS G. GARAUFIS
                                   United States District Judge