UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------- X

UNITED STATES OF AMERICA

   - v. -                                                    S1 20 Cr. 306 (NGG)

JASON KURLAND, and
CHRISTOPHER CHIERCHIO,

                           Defendants.

------------------------------------------------------- X

# LOTTERY VICTIM 3'S MOTION

# FOR RELIEF PURSUANT TO 18 U.S.C. § 3771(d)(3)

PETER J. TOMAO. ESQ.
Attorney for Victim 3
600 Old Country Road
Suite 328
Garden City, New York 11530
Tel: (516) 877-7015

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND ..........................................................................................................2

    I.     Victim 3's Relevant History ...............................................................................................2

    II.    Leading Lawyer's Learned Professional Experience .......................................................4

    III.   Media Fallout from Indictment and Further Media Coverage .........................................5

LEGAL BASIS ................................................................................................................................6

    I.     The Crime Victims' Rights Act ........................................................................................6

    II.    Protecting the Identity of Witnesses .................................................................................7

    III.   Restricting Public Access to Exhibits Regarding Witnesses ...........................................8

    IV.   Preventing Images of Victims and Granting Private Ingress and Egress ........................9

    V.    Conducting *Voir Dire* to Ensure Anonymity ..................................................................9

ARGUMENT .................................................................................................................................10

    I.     Safety Concerns Support the Anonymity Protections ...................................................10

    II.    Statutory Interpretation of the CVRA Supports the Anonymity Protections ...............11

          A.     Privacy ................................................................................................................12

          B.     Fairness ...............................................................................................................14

    III.   The Anonymity Protections are Narrowly Tailored ......................................................15

CONCLUSION ..............................................................................................................................15

# **TABLE OF AUTHORITIES**

**Cases**

*Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410 (2011) ..............................................................8
*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ..............................................................................8
*Doe v. N.H. Lottery Comm'n*, No. 2018-CV-00036 (Hillsborough South Super. Ct.)..................10
*Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019)   ..............................................11
*Maspeth Fed. S&L Ass'n v. Rubinstein*, 2018 WL 3742699 (E.D.N.Y. May 14, 2018) ...............15
*McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020)...............................................................................14
*Mirlis v. Greer*, 952 F.3d 51 (2d Cir. 2020) .................................................................................13
*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) ..............................................12
*S.C. Lottery Comm'n v. Glassmeyer*, 857 S.E.2d 889 (S.C. 2021).................................................11
*United States v. Alimehmeti*, 284 F. Supp. 3d 477 (S.D.N.Y. 2018) ..............................................7
*United States v. Amodeo*, 71 F.3d 1044 (2d Cir. 1995) ................................................................13
*United States v. Belfort*, 2014 WL 2612508 (E.D.N.Y. June 11, 2014) ........................................8
*United States v. Castleman*, 572 U.S. 157 (2014) .......................................................................11
*United States v. Cicale*, 2018 WL 388941 (E.D.N.Y. Jan. 11, 2018)............................................8
*United States v. Leora*, 2018 WL 5906846 (E.D.N.Y. Nov. 6, 2018) ...........................................9
*United States v. Madoff*, 626 F. Supp. 2d 420 (S.D.N.Y. 2009) ....................................................8
*United States v. Maxwell*, 2021 WL 5967913 (S.D.N.Y. Dec. 15, 2021) ...................................13
*United States v. Smith*, 985 F. Supp. 2d 506 (S.D.N.Y. 2013) ....................................................14
*United States v. Turner,* 367 F. Supp. 2d 319 (E.D.N.Y. 2005).............................................7, 13
*United States v. Urena*, 8 F. Supp. 3d 568 (S.D.N.Y. 2014) .........................................................7
*United States v. Zhong*, 2018 WL 6173430 (E.D.N.Y. Nov. 26, 2018) .................................. 7-8
*United States v. Whitten*, 610 F.3d 168 (2d Cir. 2010)..................................................................8
*United States DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749 (1989)...................12
*Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302 (2014) ............................................................11

**Statutes**
18 U.S.C § 3771....................................................................................................................................1
18 U.S.C § 3771(a)(8)..................................................................................................................... 6-7
18 U.S.C § 3771(d)(3) .......................................................................................................................2
18 U.S.C § 3771(e)(2)........................................................................................................................6
18 U.S.C § 3771(b)(1) ......................................................................................................................7

**Other Authorities**
BLACK'S LAW DICTIONARY 1233 (8th ed. 2004) ........................................................................12
150 CONG. REC. S4260 (April 22, 2004) ..........................................................................7, 14, 15
S.C. CONST. art. 1, § 10…………………………………………………………………………11

**PRELIMINARY STATEMENT**

Interested Party Lottery Victim 3 ("Victim 3"[1]) hereby moves this Honorable Court, pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771, (the "CVRA"), to order the anonymity protections set out below (the "Motion").

Victim 3 is compelled to seek this protection because a second victimization is potentially underway. The first victimization, of course, involves the astonishing violation of Victim 3's trust, the loss of approximately seventy million dollars, and the reprehensible conduct of Defendants. The potential second victimization is the permanent loss of anonymity that would result if Victim 3's identities are revealed during trial. Victim 3 has taken calculated steps to remain anonymous, including, regrettably, hiring Jason Kurland, Esquire. To date, Victim 3 has been able to remain anonymous. Without the cloak of anonymity, Victim 3 will face ever-present safety risks, and the loss of privacy. Accordingly, Victim 3 requests that the Court enter an Order granting the following anonymity protections to preserve their anonymity and to ensure their safety throughout the trial and afterwards.

1. Requiring the Government, Defendants, their counsel, and any witnesses, to refer to Victim 3, and any other individual, entity, or property related to them by first initials only;

2. Prohibiting the disclosure of Victim 3's identity to anyone except the Court, the jury, counsel, and Defendants;

3. Requiring the Government and Defendants to redact all filings, exhibits and demonstratives that relate to Victim 3 such that only the first initial is seen on a filing, exhibit or demonstrative, and doing so for Victim 3, and any other individual, entity, or property related to them;

4. Conducting *voir dire* in a manner where the identity of Victim 3 and any related entities are not named in open court and doing so pursuant to the protocol recently used in the *United States v. Maxwell* case tried in the Southern District;

---

[1] By "Lottery Victim 3" the undersigned refers to the husband-wife pair of victims referenced as Lottery Victim 3 in the Government's Indictment.

5. Restricting questions at trial that could be used to identify Victim 3 or otherwise lead to a loss of anonymity, including but not limited to questions that could reveal Victim 3's background, current or prior residency, family members, or current or prior occupations;

6. Providing non-public ingress and egress into the courthouse and courtroom for Victim 3's testimony to avoid potential media exposure;

7. Prohibiting courtroom sketches of Victim 3, or if courtroom sketching is permitted, requiring that the sketches portray Victim 3's appearance with blank faces and generic features; and

8. Such further relief as the Court deems warranted to protect the overriding interests, higher values, or compelling interests of Victim 3.

Victim 3 joins in the Government's motion *in limine* No. IX. Victim 3 also respectfully requests that the Court promptly review the requests made herein and issue an Order forthwith, as provided by statute, 18 U.S.C. § 3771(d)(3), to allow sufficient time for the parties to make the necessary redactions to the trial exhibits, and generally prepare for trial consistent with the requests made herein. Moreover, an early ruling would allow Victim 3 to seek mandamus relief from the United States Court of Appeals for the Second Circuit pursuant to 18 U.S.C. § 3771(d)(3), if necessary, without interrupting the Court's trial schedule.

## FACTUAL BACKGROUND

### I. Victim 3's Relevant History

On October 23, 2018, Victim-3 won one of the largest lottery payouts in United States History: $1.54 Billion.[2] Victim 3 won the Mega Millions Lottery in South Carolina, which is a state that permits lottery winners to claim their prize in total anonymity. (Victim 3 Declaration, ¶1). Victim 3 declined the commonly seen blown-up check ceremonies; rather, Victim 3 quietly

---

[2] The above statement of facts is supported by Victim 3's Declaration. The Declaration is incorporated herein and a redacted copy is attached as **Exhibit 1**. A motion to file the unredacted Declaration under seal is being made contemporaneous with the Motion.

and anonymously claimed the prize. (Victim 3 Declaration, ¶13). Victim 3 has vigorously sought to maintain their anonymity from the outset. (Victim 3 Declaration, ¶4).

Victim 3 intentionally delayed claiming the winnings until March 3, 2019—approximately five months after learning they won the prize. Victim 3 spent those intervening days, weeks, and months strategically planning the precise manner to claim the winnings to preserve their anonymity. (Victim 3 Declaration, ¶¶5-12). Due to the size of the prize, Victim 3 was naturally ecstatic. Almost immediately thereafter, Victim 3 became acutely concerned for their future safety and privacy based on the well-publicized scams and crimes perpetrated against lottery winners. (Victim 3 Declaration, ¶3). Indeed, that is precisely why Victim 3 hired Defendant Jason Kurland, Esquire ("Mr. Kurland"). (Victim 3 Declaration, ¶9). At the time, Mr. Kurland was reputed as the national go-to lawyer for lottery winners. Victim 3 chose Mr. Kurland because they believed Mr. Kurland represented their best opportunity to remain safe and anonymous. (Victim 3 Declaration, ¶9). Without question, Mr. Kurland understood this, too.

When Victim 3 first approached Mr. Kurland regarding representation, they did so by using a "burner" phone. (Victim 3 Declaration, ¶7). They initially met Mr. Kurland in a city located in a state different than their resident state. (Victim 3 Declaration, ¶8). When Victim 3 retained Rivkin Radler, LLP and Mr. Kurland, the law firm set up their client files with the use of a pseudonym name. (Victim 3 Declaration, ¶10). Mr. Kurland created Victim 3's legal entities in a manner that showed only Mr. Kurland's name on the legal paperwork. (Victim 3 Declaration, ¶17).

Victim 3 has chosen to avoid disclosing their lottery win to all members of their immediate family. (Victim 3 Declaration, ¶19). Victim 3 has hired security professionals to advise and assist in protecting their safety. (Victim 3 Declaration, ¶20). Victim 3's name has never been released to the public as the winner of the October 23, 2018, Mega Millions Lottery. (Victim 3 Declaration,

¶22). Victim 3 has scrupulously endeavored to maintain their anonymity as the winner of that lottery, and respectfully asks this Honorable Court to assist them in continuing to remain anonymous. (Victim 3 Declaration, ¶23).

## II. Leading Lawyer's Learned Professional Experience

Victim 3's decision to remain anonymous to protect their safety and privacy is grounded on the statements of experienced and reliable professionals. Victim 3 provides the following information based upon the sworn affidavit of William V.A. Zorn, Esquire ("Mr. Zorn"), which is incorporated herein and attached as ***Exhibit 2***.

Mr. Zorn is an attorney licensed to practice law in New Hampshire and Massachusetts. (Zorn Affidavit, ¶1). During Mr. Zorn's 42 years of practice, he has represented 17 lottery winners in New Hampshire, Vermont, Maine, and Massachusetts. (Zorn Affidavit, ¶2). Mr. Zorn's affidavit is "based on [his] professional experience representing lottery winners." (Zorn Affidavit, ¶2). When representing lottery winners, it is Mr. Zorn's learned opinion that, "one of the most immediate concerns is to preserve the winner's anonymity." (Zorn Affidavit, ¶3). "Lottery winners whose names become public are subject to immediate unwanted solicitations and harassment." (Zorn Affidavit, ¶3). In his experience, these "approaches are made not only to the lottery winners, but also to family members including minor children." (Zorn Affidavit, ¶3). In Mr. Zorn's personal experience, lottery winners also face the threat of physical safety. (Zorn Affidavit, ¶4). Based on his practice, "[s]everal lottery winners whom [he] ha[s] represented have legitimately been concerned for their physical safety and that of their children." (Zorn Affidavit, ¶4).

In summary, Mr. Zorn's affidavit provides that "[b]ased on these experiences and those which are published in the popular press, the recommendation of maintaining the anonymity of

4

the lottery winner is critical." (Zorn Affidavit, ¶5). The experience and opinions of Mr. Zorn are borne out by credible media reports.[3]

### III. Media Fallout from Indictment and Further Media Coverage

On the day that the original indictment was unsealed, the NY Times[4], ABC News[5], and Forbes[6] ran articles covering the story. Yahoo News[7] and NBC News[8] picked up the story the next day. In South Carolina, days after the original indictment was unsealed, local media published numerous articles and highlighted the connection to Victim 3.[9] These articles did not publish the

---

[3] *See, e.g.*, Chicago Tribune, "Puzzling Cliffhanger in Case of Poisoned Chicago Lottery Winner," published June 11, 2016, at Puzzling cliffhanger in case of a poisoned Chicago lottery winner - Chicago Tribune; ABC News, "Abraham Shakespeare Killing: Woman Accused of Shooting Lotto Winner Goes on Trial, published November 27, 2012, at Abraham Shakespeare Killing: Woman Accused of Shooting Lotto Winner Goes on Trial - ABC News ; CBS News, "Lottery Winner Stabbed to Death," published May 8, 2008, at https://www.cbsnews.com/news/lottery-winner-stabbed-to-death/#app and Fox News, The 'curse' of winning the lottery," published February 6, 2019, at The 'curse' of winning the lottery? | Fox News.

[4] https://www.nytimes.com/2020/08/18/nyregion/lottery-lawyer-fraud.html

[5] https://abcnews.go.com/US/lottery-lawyer-allegedly-swindled-jackpot-winners-107m-scheme/story?id=72447202

[6] https://www.forbes.com/sites/danielcassady/2020/08/18/new-york-lawyer-accused-of-conning-lottery-winners-out-of-107-million/?sh=2ba326a231b7

[7] https://www.yahoo.com/now/lottery-lawyer-accused-swindling-winners-042720152.html

[8] https://www.nbcnews.com/news/us-news/lottery-lawyer-others-accused-swindling-winners-out-millions-n1237239

[9] https://www.abccolumbia.com/2020/08/20/lottery-lawyer-indicted-accused-of-stealing-millions-from-1-5-billion-winner/; https://www.wyff4.com/article/attorney-for-dollar15-billion-simpsonville-lottery-winner-charged-with-fraud-doj-officials-say/33648479#; https://www.wltx.com/article/news/crime/lottery-lawyer-accused-of-swindling-sc-winner-of-millions/101-ccce53fe-22c6-4b1f-90dd-215d558d2c7f

5

names of Victim 3 because the Government's indictment and detention letter only referred to them as Victim 3.

The trial will certainly garner renewed media attention. Reuters News ran an article on February 23, 2022, regarding the Court's order addressing Defense motions for suppression and other matters.[10] Moreover, the undersigned has received and declined a media inquiry from a reporter from a major national news organization that is investigating this case. Further, Law360 is covering this case. It has published five articles so far this year, the most recent last week: January 27, 2022, February 23, 2022, May 20, 2022, May 24, 2022, and June 8, 2022.[11]

The media attention threatens to upend Victim 3's coveted anonymity and could cause Victim 3 and their family to become vulnerable to unwanted solicitations, harassment, and potentially worse. As a result, Victim 3 looks to this Court to prevent a second victimization through the disclosure of their identity at a trial.

## LEGAL BASIS

### I. The Crime Victims' Rights Act

The CVRA grants rights to individuals or entities directly and proximately harmed as a result of the commission of a federal offense. 18 U.S.C. § 3771(e)(2). Section 3771(a)(8) grants

---

[10] https://www.reuters.com/legal/government/lottery-lawyer-loses-bid-suppress-phone-evidence-separate-trials-2022-02-23/

[11] January 27, 2022 - https://www.law360.com/articles/1459294/lottery-lawyer-says-feds-have-pattern-of-misconduct; February 23, 2022 - https://www.law360.com/articles/1467579/lottery-lawyer-can-t-split-trial-from-alleged-mafia-allies; May 20, 2022 - https://www.law360.com/trials/articles/1495580/-lottery-lawyer-again-pleads-not-guilty-in-shifting-case; May 24, 2022 - https://www.law360.com/articles/1496555/lottery-lawyer-pal-pleads-out-as-severance-bids-renewed; June 8, 2022 - https://www.law360.com/articles/1500598/lottery-lawyer-and-alleged-mafioso-stuck-with-joint-trial

crime victims "[t]he right to be treated with fairness and with respect for [their] dignity and privacy." The CVRA directs that "[i]n any court proceeding involving an offense against a crime victim, the court shall ensure that the crime victim is afforded the rights described in subsection (a)." 18 U.S.C. § 3771(b)(1). Indeed, the rights granted by the CVRA were intended to make victims an independent participant in the proceedings. *United States v. Turner,* 367 F. Supp. 2d 319, 322 (E.D.N.Y. 2005) (finding that "the CVRA gives crime victims direct standing to vindicate their procedural and substantive rights in criminal cases independently of prosecutors").

The CVRA was intended to "correct, not continue, the legacy of poor treatment of crime victims in the criminal process" and "to keep victims safe from further harm." 150 CONG. REC. S4260, S4269, S4275 (April 22, 2004) (statements of Sens. Feinstein and DeWine).[12] It was not Congress's intent for the CVRA to be "whittled down or marginalized by the courts or the executive branch." *Id.* (statements of Sen. Feinstein). The Senate sponsors of the CVRA intended that courts "promote a liberal reading of the statute in favor of interpretations that promote victims' interests in fairness, respect, and dignity." *Turner,* 367 F. Supp. 2d at 335.

## II. Protecting the Identity of Witnesses

In certain fact patterns, courts routinely allow witnesses to testify anonymously either under a pseudonym or through the use of a first name or initial only. *United States v. Zhong*, 2018 WL 6173430, *2 (E.D.N.Y. Nov. 26, 2018) (granting government's motion to have victim witnesses in forced labor case to testify using pseudonyms); *United States v. Alimehmeti*, 284 F. Supp. 3d 477, 490-91 (S.D.N.Y. 2018) (permitting government to call witnesses using pseudonym where "the information that the [government seeks to] preclude the defense from publicly eliciting a UC's identity is neither exculpatory . . . nor evidently relevant at trial"); *United States v. Urena*,

---

[12] https://www.congress.gov/108/crec/2004/04/22/CREC-2004-04-22.pdf

7

8 F. Supp. 3d 568, 573 (S.D.N.Y. 2014) ("Moreover, nothing about UC-188's real name goes to his credibility or knowledge regarding the subject of his testimony."). Further, trial courts "retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice . . ., the witness' safety, or interrogation that is . . . only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *United States v. Whitten*, 610 F.3d 168, 183 (2d Cir. 2010).

### III. Restricting Public Access to Exhibits Regarding Witnesses

Courts routinely redact trial exhibits or place trial exhibits under seal. Courts also regularly uphold the privacy rights of victims as overriding and compelling interests against the presumptive public access under both the First Amendment and federal common law. *United States v. Madoff*, 626 F. Supp. 2d 420, 426-27 (S.D.N.Y. 2009) (redacting identifying information of objecting victims and finding that the victims' privacy interests are significant based on the sentiments of the objecting victims and the Court's duty to the victims); *United States v. Belfort*, 2014 WL 2612508, *9-10 (E.D.N.Y. June 11, 2014) (ruling for the Government and denying media request to obtain names and addresses of individual victims and noting that disclosure could potentially cause victims to "suffer embarrassment at being identified as a victim of a boiler-room scam, media contacts that may well be unwelcome, and further victimization by fraudsters"); *United States v. Cicale*, 2018 WL 388941, *14 (E.D.N.Y. Jan. 11, 2018) (holding that witnesses and criminal defendant's safety was a compelling interest that justified keeping information regarding his location under seal, and that "the exclusive redaction of such information was narrowly tailored to preserving the defendant's safety while doing the least violence to the First Amendment").

Arguably, the CVRA right to privacy displaces the federal common law presumption of access as it relates to crime victims. *See Am. Elec. Power Co v. Connecticut*, 564 U.S. 410, 423-

24 (2011) (discussing the displacement of federal common law when Congress passes a statute that "speaks directly to the question" at issue) (citations and quotations omitted).

### IV. Preventing Images of Victims and Granting Private Ingress and Egress

Courts have also entered orders preventing courtroom artists from displaying characteristics that would allow a person to recognize a sketch of a witness. *United States v. Leora*, 2018 WL 5906846, *15-16 (E.D.N.Y. Nov. 6, 2018) (ordering that any sketches of two witnesses must portray the witnesses with blank faces and generic features and requiring that the sketches be shown to the Government before taken from the courtroom to allow for a ruling, if necessary, on the sketches before being publicly disseminated). The same line of legal analysis should shield a witness from media photographers by allowing a victim to enter and exit the courthouse and Your Honor's courtroom through non-public access points.

### V. Conducting *Voir Dire* to Ensure Anonymity

Courts have also conducted *voir dire* in a manner to protect the anonymity of certain witnesses. In the *Unites States v. Maxwell* case, the parties apparently agreed to the following protocol.

> [T]he Government proposes that prospective jurors be handed a sheet with a list of names and places that may come up at trial. That sheet, which would be filed under seal, would contain the true names of witnesses. The sheet would not be read aloud; instead, the Government requests that the Court direct prospective jurors to read the sheet and to raise a hand if they are familiar with the witness or locations. Examination on this subject would then be conducted at sidebar, with the transcript redacted to remove witness identifying information.

*United States v. Maxwell*, 1:20-cr-00330-AJN, Doc. No. 436, p. 2-3 (incorporated herein and attached as ***Exhibit 3***).

9

ARGUMENT

The safety concerns identified in Mr. Zorn's affidavit, and the credible media reports of physical threats to lottery winners, alone, justify the anonymity protections sought under the CVRA. Further, Victim 3 is clearly a "crime victim" under the CVRA. Therefore, Victim 3 has a statutory right to privacy and fairness. Victim 3 will suffer permanent injury unless the requested anonymity protections are ordered by the Court. If their anonymity is lost during this trial, ***it is lost forever***.

I. **Safety Concerns Support the Anonymity Protections**

Victim 3's personal safety, alone, justifies ordering the anonymity protections. As noted above, there have been numerous instances of reported violence to lottery winners. Indeed, Mr. Kurland himself has made public statements about security and safety concerns.[13] Recently, a New Hampshire Court entered an order allowing a lottery winner to claim the winnings anonymously by citing security concerns.[14] *Doe v. N.H. Lottery Comm'n*, 2018-CV-00036, at pp. 7-8 (Hillsborough South Super. Ct., March 12, 2018) (Temple, J.) (attached as ***Exhibit 4***). To support its decision, the New Hampshire court relied upon a South Carolina trial court order that enjoined the release of a South Carolina lottery winner's personal information. *Id.* at pp. 7-8 (citing *S.C.*

---

[13] CNBC Article, "Mega Millions jackpot hits $1 billion — but it's much tougher to actually win" published October 17, 2018, at https://www.cnbc.com/2018/10/17/if-you-win-the-mega-millions-jackpot-heres-how-to-maintain-some-privacy.html (quoting Mr. Kurland: "Not only do they have to deal with the stress of a media event, and answering questions from a room full of cameras and reporters, but they're also concerned about their safety and the safety of their family")

[14] Moreover, and as noted in the Court's recent severance order, this case involves an alleged "soldier" in a crime family. [Docket No. 189, p. 8]. Further, the Government intercepted conversations of Defendants that "reaffirmed the sentiment clearly shared by all the co-conspirators [that] '[n]obody gives a f*** about a billionaire or hurting them or what not." [Docket No. 9, p. 25]. While Victim 3 recognizes the Court has entered a protective order for Defendants and their counsel, it always remains the case that the Court cannot limit what is done with information learned in open court.

10

*Lottery Comm'n v. Glassmeyer*, 2015 WL 13685046, at *4 (S.C. Court of Common Pleas, Nov. 17, 2015)).

In the South Carolina case, the South Carolina Lottery Commission (the "SCLC") vigorously opposed a freedom of information request seeking personal information of lottery winners.[15] Indeed, the SCLC filed an action against the applicant to obtain a declaration that he was not entitled to obtain lottery winners' names and addresses under the state's freedom of information law. The SCLC took the position that the information sought was personal and "disclosure . . . would constitute unreasonable invasion of personal privacy." *S.C. Lottery Comm'n v. Glassmeyer*, 857 S.E.2d 889, 892 (S.C. 2021). The SCLC obtained a permanent injunction, and a judgment on the pleadings. The SCLC defended the win to the South Carolina Court of Appeals (the state's intermediate appeals court) and then the South Carolina Supreme Court, which reversed the trial court's order and remanded for further factual findings. *Id.* at 892-94.

## II. Statutory Interpretation of the CVRA Supports the Anonymity Protections

The CVRA uses the words "privacy" and "fairness." Those words are undefined in the statute. Unless otherwise defined, statutory terms are "interpreted as taking their ordinary, contemporary, common meaning" at the time the law was enacted. *See, e.g.*, *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362-63 (2019). Undefined words should also be interpreted in context and in light of the statutory structure as a whole. *Utility Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014). Finally, words and phrases are presumed to bear the same meaning when used in statutes of similar purposes. *United States v. Castleman*, 572 U.S. 157, 174 (2014) (Scalia, J., concurring) ("Although the presumption of consistent usage is most commonly applied

---

[15] South Carolina is unique in that it's state constitution specifically creates a constitutional right to privacy for the protection of its citizens against the government. S.C. CONST. art. I § 10 (providing that "unreasonable invasions of privacy shall not be violated").

11

to terms appearing in the same enactment, (*e.g.*, *IBP, Inc. v. Alvarez*, 546 U. S. 21, 33-34 (2005)), it is equally relevant 'when Congress uses the same language in two statutes having similar purposes,'" (citing *Smith v. City of Jackson*, 544 U. S. 228, 233 (2005) (plurality opinion)); *see also Northcross v. Board of Educ. of Memphis City Schools*, 412 U. S. 427, 428 (1973) (per curiam)).

### A.    Privacy

The CVRA was enacted in 2004. At that time, Black's Law Dictionary defined privacy as, "the condition or state of being free from public attention to intrusion into or interference with one's act or decisions." BLACK'S LAW DICTIONARY 1233 (8th ed. 2004). This definition of privacy fits hand in glove with the requested anonymity protections. Further, this definition is consistent with prior interpretations of privacy within statutes of similar purpose. *See United States DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989) (discussing exemptions to the FOIA statute, finding both the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.); *see also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 165 (2004) (noting that exemption 7 to the FOIA statute "requires us to protect, in the proper degree, the personal privacy of citizens against the uncontrolled release of information").

Victim 3's anonymity protection requests are, respectfully, an easy application of the CVRA statute. As noted above, Victim 3 collected the prize anonymously. Victim 3 has scrupulously maintained that anonymity ever since. Against the backdrop of these facts, Victim 3's requests to essentially maintain the status quo fits squarely within the definition of privacy. The harder application of a CVRA motion, not present here, would be for an otherwise known person to seek anonymity protections at trial.

A crime victim's privacy interests under § 3771(a)(8) should operate as a thumb on the scale when considered against traditional privacy rights afforded to other participants in a trial. *See United States v. Maxwell*, 2021 WL 5967913, *3-4 (S.D.N.Y. Dec. 15, 2021) (recognizing distinction between crime victim witnesses and regular witnesses). Furthermore, Victim 3 has been referred to in public filings as Victim 3 without issue. *Turner*, 367 F. Supp. 2d at 328 (noting the use of pseudonyms in the complaint strongly suggests disclosure of victim identities invades the privacy of victims). While Victim 3's privacy concerns are different than the privacy concerns typically raised, innocent third-parties privacy interests do not always fit "comfortably under the rubric 'privacy,' [but] are a venerable common law exception to the presumption of access." *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995). Here, of course, Victim 3's statutory right to privacy arguably displaces the federal common law presumption.

If Victim 3 is named in open court, they will be subjected to significant, unwanted national media attention. There can be no doubt that the media focus on Victim 3 would be immediate and sustained.[16] The Second Circuit recently acknowledged the reality of the harm that national or viral coverage can now inflict. *Mirlis v. Greer*, 952 F.3d 51, 66 (2d Cir. 2020) ("Given the proliferation of smartphones and improved digital streaming capabilities . . . [c]ommon sense and over two decades of widespread and constant use of the Internet are sufficient to tell us that a video of a person describing details of his abuse is likely to garner more attention, be distributed more widely, and last longer in the public's attention than are copies of a transcript or even local news articles.").

---

[16] The Washington Post, https://www.washingtonpost.com/nation/2019/03/14/woman-claimed-her-billion-mega-millions-jackpot-her-identity-may-be-secret-forever/ published March 14, 2019 (quoting Mr. Kurland: "'It's ridiculously large, and you become an easy target,' he said of the money. 'Friends, family, bogus charities and con artists — they all come around when a prize becomes public. And social media makes it easier for someone to piece together details and track down anyone who may decline to provide their name,' Kurland said. He declined to provide any other descriptions of the winner.").

In addition to reporters, podcast hosts, and other content creators, Victim 3 would immediately become an enormous target for scams, cyber-attacks, ransomware, and identity fraud. *United States v. Smith*, 985 F. Supp. 2d 506, 524 (S.D.N.Y. 2013) ("It is well settled that preventing harm to a person's economic interests is an appropriate purpose of a protective order.") (internal citation omitted).

### B. Fairness

Victim 3 has a statutory right to be treated with fairness. The Court's duty is to ascertain and follow the meaning of the statute; if during its work an ambiguous statutory term emerges, the Court can consult contemporaneous usages, customs, and practices. *McGirt v. Oklahoma*, 140 S. Ct. 2452, 2468 (2020). Further, legislative history can also serve as an interpretive aid, but legislative history should only be used to clear up ambiguity about a statute's meaning. *See id.* ("The only role [extracontextual sources] can properly play is to help 'clear up . . . not create' ambiguity about a statute's original meaning.") (quoting *Milner v. Dep't of the Navy*, 562 U. S. 562, 574 (2011)).

The CVRA does not include a definition of the word "fairness"; neither does the 8th Edition of Black's Law Dictionary. Therefore, the statements made by the Congressional sponsors of the CVRA bill are relevant for the limited purpose of clearing up any ambiguity of the term. Senator Kyl instructed:

> I would like to turn to section 2, (a)(8). This provision contains a number of rights. The broad rights articulated in this section are meant to be rights themselves and are not intended to just be aspirational. One of these rights is the right to be treated with fairness. Of course, fairness includes the notion of due process. ***Too often victims of crime experience a secondary victimization at the hands of the criminal justice system***. This provision is intended to direct Government agencies and employees, whether they are in executive or ***judiciary*** branches, to treat victims of crime with the respect they deserve.

150 CONG. REC. at S4269 (statement of Sen. Kyl) (emphasis added).

14

Any ambiguity that may exist in the statutory use of the word "fairness," notwithstanding, the word fairness has a regularly understood meaning—and one that a Court knows well. Fairness means evenhanded. Just. Equitable. Free from injustice.

The statutory right to be treated with fairness should result in the anonymity protections requested. The primary reason that Victim 3 hired Mr. Kurland was to ensure they remained anonymous. It would be manifestly unfair for Victim 3 to lose that anonymity by taking part in the trial of the very person that was hired to keep their anonymity intact in the first place. As noted above, the CVRA was intended to "correct, not continue, the legacy of poor treatment of crime victims in the criminal process" and "***to keep victims safe from further harm***." 150 CONG. REC. at S4269, S4275 (statements of Sens. Feinstein and DeWine) (emphasis added). Enacting the anonymity protections requested by Victim 3 fits snugly within the language and purpose of the CVRA.

### III. The Anonymity Protections are Narrowly Tailored

Finally, Victim 3's Requests are narrowly tailored. Victim 3 does not seek to close the courtroom or restrict the public's presence during the trial. Nor does Victim 3 seek to limit questioning or redact information that could be relevant to the subject matter of the case. *Maspeth Fed. S&L Ass'n v. Rubinstein*, 2018 WL 3742699, *3 (E.D.N.Y. May 14, 2018) (distinguishing between privacy interests of victims in personal identifying information and amounts claimed in restitution). As a result, the anonymity protections requested by Victim 3 should, respectfully, be ordered.

### CONCLUSION

Victim 3 will face specific and real threats to their safety and privacy if their identity is made public at trial. Victim 3 will likely face threats of violence. Victim 3 will become a target for

15

financial crimes and scams, and Victim 3 will be unfairly thrust into the national media spotlight. Disclosure of their identity in the courtroom will negatively and permanently impact all aspects of Victim 3's lives. Victim 3 respectfully moves this Court to protect them from the second victimization that would transpire from their loss of anonymity.

Dated: June 16, 2022
      Garden City, New York

                              Respectfully submitted,

                              */s/Peter J. Tomao*
                              Peter J. Tomao
                              Attorney for Victim 3
                              600 Old Country Road
                              Suite 328
                              Garden City, New York 11530
                              (516) 877-7015
                              ptomao@tomaolaw.com