UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,                      :
                                                :
   - v. -                                       :         20-CR-306 (NGG)
                                                :
CHRISTOPHER CHIERCHIO,                          :
                                                :
                     *Defendant.*              :
-----------------------------------------------------------X

**SENTENCING MEMORANDUM ON BEHALF OF CHRISTOPHER CHIERCHIO**

Gerald J. McMahon, Esq.
11 Burnham Court
Scotch Plains, NJ 07076
908-347-4670
gm@geraldjmcmahon.com

Thomas Harvey, Esq.
The Law Offices of Thomas A. Harvey, PLLC
9 Pheasant Rd West
Pound Ridge, NY 10576
(212) 972-8935
taharvey28@aol.com

Anjelica B. Cappellino, Esq.
22 Powers Street
Brooklyn, NY 11211
(917) 440-3715
acappellinoesq@gmail.com

## INTRODUCTION

On June 14, 2023, Christopher Chierchio (age 55) will appear before this Court to be sentenced for one count of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 371. Although Mr. Chierchio faces a Guidelines range of 78 to 97 months' imprisonment pursuant to the plea agreement – or 57 to 71 months' imprisonment, as discussed below – with a statutory maximum sentence of 60 months' imprisonment, we respectfully ask the Court to impose a non-incarceration sentence, or in the alternative, the lowest sentence possible, in consideration of Mr. Chierchio's individualized circumstances and history. By requesting this sentence, neither Mr. Chierchio nor defense counsel seek to minimize the severity of his actions or deny his responsibility for the offense committed. However, Mr. Chierchio's offense represents much less than the sum of his character and history. In the following sections, we set forth (I) relevant information concerning Mr. Chierchio's background, personal history, and characteristics; (II) a summary of the Guidelines calculations; (III) information relevant to the factors outlined in 18 U.S.C. § 3553(a); and (IV) letters from family and friends in support of Mr. Chierchio. We respectfully submit that the below information establishes the need for a non-incarceration sentence in Christopher Chierchio's case.

### I. CHRISTOPHER CHIERCHIO'S PERSONAL HISTORY

**Early Years and Family Life**

Christopher Chierchio was born to Giro (age 79) and Phyliss (age 76) in Brooklyn, New York. Mr. Chierchio's mother worked as a homemaker and his father, now retired, was previously employed by Mr. Chierchio's plumbing business, RCI Plumbing, as a supervisor. His parents are currently healthy, however, Mr. Chierchio's father is a prostate cancer survivor. Mr. Chierchio has a younger brother, Michael Chierchio (age 37) who also resides in Brooklyn and is employed as a

1

maintenance worker. Mr. Chierchio enjoys a close relationship with his parents and brother, who are all aware of his involvement in the instant offense and remain supportive.

Mr. Chierchio grew up in Brooklyn, where he resided until he was 20 years old, when he then relocated to Staten Island. In 1997, at age 29, Mr. Chierchio married Lisa Fortino in Brooklyn. Lisa works as a title closer. Their marital union, which lasted over twenty years until their separation in 2020, produced three daughters – ages 23, 20, and 16. Their eldest daughter, Samantha, is a graduate of Penn State University, and is currently in graduate school. Their middle daughter, Sabrina, is a student at St. John's University going into her senior year and their youngest, S.C., currently attends high school. Mr. Chierchio shares a close relationship with all of his daughters, and fully supports their needs and emotional well-being. He also enjoys a civil relationship with his wife, Lisa, despite their separation, and Lisa has positively described Mr. Chierchio's parenting and the effect prison time will have on the family and children.

Mr. Chierchio's indictment in the instant matter, as well as his separation from his wife, has taken an emotional toll on all of his daughters, especially the youngest two. His middle daughter, in particular, suffers from anxiety attacks and mental health issues in connection to the instant case. Upon onset of these symptoms, Mr. Chierchio immediately ensured that his daughter received the appropriate resources and therapy. Despite no longer living in the marital home, Mr. Chierchio sees his daughters on a weekly basis and remains active in their lives. As Sabrina, Mr. Chierchio's middle daughter, writes:

> My dad has been a very crucial part of my life. We have a type of relationship that not many people have with their daughters. I am completely heartbroken that he is going away and will be missing very important years of my life. He will be missing important milestones such as my college graduation, my 21st birthday, etc. When my parents split up, my whole life turned around, and I went through a major rough patch. I was trying to figure myself out, and I didn't know what I wanted. I have struggled with many anxiety/panic attacks, and I was in therapy for quite some time. And it may sound corny, but if my dad was not by my side through all of this, I

2

would be a very different person today. He was there for every single anxiety attack; he was there when I was confused about the person I wanted to be; he was there and gave me advice on life situations; and he was always there when I needed a shoulder to cry on. Ever since this rough phase of my life, I have grown a certain attachment to him that I never thought I would have with anyone in life. He is my hero. He is my best friend. I can't believe that I have to come to terms with the fact that I have to learn to live without him by my side for the next couple of years.[1]

In addition, Mr. Chierchio's eldest daughter, Samantha, poignantly notes the negative impact prison time will have on her family, especially her youngest sister:

Throughout my childhood, we had a tight knit family structure. We are a family of five who always kept traditions whether it be birthdays, holidays, and especially Sunday dinners. When my parents were together my sister Sabrina, and I had that strong family bond as we all lived in one house. However, since my father moved out, my youngest sister…was not able to grow up and be a teenager with a daily supportive family bond inside our home. The split and legal trouble has caused her to lose out on simple blessings such as sitting in the living room at night as a family talking about our days. However, since [S.C.] is a busy 16-year-old in school and extracurriculars, she is only able to see her father once a week. I believe that a harsh sentence and having her father in prison would negatively affect her teenage years and mental health during this time of crucial development.

Since this situation is not common amongst friends and family of ours, [S.C.] is often left upset and confused as to why this is the situation her family is in. It makes me feel terrible that she may be 20 years old when her father is released from prison. I myself am a very family-oriented person and as the oldest child I tried my best to try and keep my parents together. Although that failed, thankfully my parents have a good relationship when it comes to my sisters and me. As we are getting older, our relationship with our father is becoming a more mature, understanding, and loving one. We do not want to lose out on that and especially hope that it does not get taken away from the youngest…

Since we are all very busy with school and work, it makes it difficult to see our father since he does not live with us anymore. Having him go away to prison for years would make that once a week turn into much longer. We love and adore our father for he has always been a helping hand, incredible loving father, shoulder to cry on, and good laugh when needed. As children of separated parents, we value the time we are able to see our father or go visit him at his home. My sister and I both work two jobs and are in school. I am currently a master's student and juggle two jobs a day while trying to keep up with family time. I truly do not want this for my family, especially for S.C. Having a parent in jail is not something I wanted for my sisters. It makes me extremely nervous as I have grown up around some

---

[1] *See* Exhibit A, Sabrina Chierchio Letter.

3

teenagers who had a father in jail. Those kids did not turn out so good. I do not want this to take a toll on my sister's emotional and mental well-being…

The reason I have not gone into depth my emotion towards this situation is because as the oldest I need to be the rock for my younger siblings and for my mother to help her out. Therefore, I will be dealing accordingly with whatever sentencing time is decided. However, please consider no more than two years in prison. I need my family to only grow closer and supportive of one another especially throughout [S.C.'s] teenage years. I do not want her to be going away to college after her father is to come home from prison or still is in prison. I believe and want her to have a relationship with her father and healthy relationship with herself throughout this time. If you are a father or oldest sibling, please try to empathize with me and understand where I am coming from. I know you have most definitely received millions of letters throughout your career as a judge. However, I do not feel my father is a threat to society, but I do know he is an involved family man and father figure we need present in our lives.[2]

**Career and Charitable Works**

Upon graduating high school in 1986, Mr. Chierchio immediately entered into the workforce in order to help his family financially as well as gain independence. Interested in learning a trade, Mr. Chierchio learned plumbing and began working as a freelance plumber. He was very dedicated to his job, even forgoing his own high school graduation in order to take care of a customer.

Between the ages of 20 to 25, Mr. Chierchio took a brief sabbatical from plumbing and worked in the music industry, performing songs as a hip hop artist. He enjoyed success with his music and even went on tour with Debbie Gibson – a popular, nationally known pop artist of the time.

But eventually, Mr. Chierchio decided to go back to his trade and manage his own plumbing company, RCI Plumbing Inc., based in Staten Island, New York, for the past two decades. RCI, which was owned by his wife and close friend, and supervised by his father,

---

[2] *See* Exhibit B, Samantha Chierchio Letter.

4

employed over 500 employees over the years, and was one of the leading plumbing companies in the area.

Unfortunately, in part due to the COVID-19 pandemic, Mr. Chierchio's plumbing business declined and he was unable to take on any new clients since 2020. Around that time, Mr. Chierchio entered into the business of wholesale distribution of personal protective equipment ("PPE"). As discussed further below, the instant offense stems from Mr. Chierchio's involvement in this industry. Mr. Chierchio is now employed by Pinnacle Electric, an electrical contractor, where he has remained for the past six months. As Pinnacle's owner, Antony Gironta explains, it was Mr. Chierchio who helped him when he was struggling with his business during COVID-19:

> When I called him one day in distress feeling like the world was closing in on me. He offered to help me. I immediately said Chris we have no money I can't afford to pay you. He instantly said my man I'm not looking for money, and he stated some proverb from the Bible probably back in the day from being a Jehovah witness, saying something to the affect you help people without expecting anything in return…I was blown away by this. Without his moral support through the last year I can tell you that my company and the 500 families we support would not be where we are today. When I was down and thought it was over, he would bring me back and give me focus, he would email in the middle of the night early in the morning and all day long. He truly took my issue on as if it were his own. I can tell you now that my company is thriving we still have all of our employees and are doing very well.[3]

Aside from his career, Mr. Chierchio has dedicated an enormous amount of time to charitable causes, most notably, the Danielle Antar Foundation. Founded in 1996 by Michael J. Marino, is a not-for-profit corporation based in New York and dedicated to supporting children's causes such as those suffering from cancer and other illnesses. Mr. Chierchio became involved with the organization in 2005 and is a key contributor to its fundraising efforts. He has donated innumerable amounts of time, money, and effort to the foundation, particularly during the last few years when COVID-19 took its toll on fundraising.

---

[3] *See* Exhibit C, Antony Gironta Letter.

As founder, Michael Marino, stated in a speech during one of their fundraisers in 2021:

> Allow me to tell you a story about how one person can come along and change the lives of others for the better. The name of this person is Chris Chierchio. Everyone should know that although I started the Danielle Antar Foundation, Chris has been a driving force taking us from 300 to 600 strong throughout the years. After the first party he attended in 2005, he asked to get involved. Since then, he has run circles around me in making sure our fundraiser is a success year after year.
>
> I must admit this year I was in a panic due to this aching economy and the hard hits of the recession. So I called Chris and told him I was thinking of canceling the party and doing something on a much smaller scale. He told me that no matter what we were going to have the party even if we had to pay for it ourselves. He then proceeded to sell 70 percent of the seats that are filled today.
>
> His message was clear: Everyone needs to forget about their own problems for one night and have a good time knowing that their presence here has contributed to easing the burden of those in need. He reminded me that we should never give up no matter how bad things get. We should never lose sight of our purpose here and who we do this for. We do it for the children who need our help. We do it for the kids who are struggling with cancer, diabetes, learning disabilities, and the physically or mentally challenged. These children know nothing of our recession troubles, and as parents we would trade places with our children in a heartbeat if it would take away their pain. For a minute, I almost forgot what we were really trying to accomplish here, as I got wrapped up in my own problems as so many of us do from time to time. Until Chris reminded me of what this party is really about.[4]

Mr. Chierchio's role goes above and beyond donating money. He is hands-on in all aspects of the foundation, which include personally selecting a recipient of the funds, visiting the family at home, and speaking with the children. A number of families who have received support from the Danielle Antar Foundation have written to express their support and gratefulness for Mr. Chierchio.

As Natale Enrico and Josephine Bruzzese, the parents of a chronically ill child, write:

> We write to you today to endorse a very special human being, Christopher Chierchio…Chris runs and operates the Danielle Antar Foundation, a charity foundation that helps chronically ill children get the care they need. Through his charity foundation and his enormous heart, Chris has helped [their daughter] receive special, difficult-to-obtain treatment and necessary antibiotics both in the

---

[4] *See* Exhibit D, Michael Marino speech.

> US and abroad. Chris is strong in his faith, and consistently does for others. We consider Chris to be a true philanthropist and an exemplary human being…
>
> Chris's foundation paid for [her] medical and living expenses which kept my family from homelessness, and enabled us to focus on navigating the health care system in an effort to get [her] the help she needed. Additionally, through Chris's relentless efforts, we have been able to focus on spreading awareness about the disease and help countless others find a path to wellness. Chris has lifted my family from very difficult times on many different occasions. I never knew who Chris Chierchio was prior to my daughter's illness; I had never met him before. Chris could have chosen to sit idly by, but instead he went above and beyond to help a family in need—my suffering family. He came to us with concern, love, consolation, and advice. Chris selflessly sacrificed his time and love for a family he had never met before. Chris has a heart of gold and I affirmingly attest that he is a tremendous asset to society.[5]

Frank and Patricia LaGrippo, parents to an 18-year old who was diagnosed with cerebral palsy at six months of age, write:

> We have been lucky enough to have been recipients of the foundation grant in 2013, which helped provide us with much needed equipment to assist with [their daughter's] recoveries due to multiple surgeries to assist during her rehabilitation. He has done such good work for families that have children with disabilities and has championed for them to help with services and equipment, we were grateful and admire his drive for the underdogs. My wife and I work hard to provide for our family but with caring for a child who is disabled we all need a superhero that will offer us extra support.
>
> I have had the pleasure of knowing Chris Chierchio for over 10 years and during this time, I have come to know him as a person of integrity, honesty, and strong moral character. We know Chris is remorseful for the situation at hand and we are confident that he will do better with his life. He will continue to help those that are in need. He has the ability to make a difference in someone's life as he had with our daughter... Chris has the knowledge to teach those around him about doing good for those that need it.[6]

**<u>Health Conditions</u>**

While Mr. Chierchio has dedicated himself to the well-being of his family and others, he has experienced his own health battles in recent years. He suffers from accelerated hypertension with hypertensive heart disease, for which he takes two prescriptions, Type-2 diabetes mellitus

---

[5] *See* Exhibit E, The Bruzzeses Letter
[6] *See* Exhibit F, The LaGrippos Letter

7

with hyperglycemia, morbid obesity, sleep apnea, and an enlarged prostate, which due to his family history, requires observation. Mr. Chierchio has also been referred to a cardiologist who he is scheduled to visit on May 30, 2023 to assess whether the hypertension is negatively impacting the heart. This past February, he underwent knee surgery to repair a complex tear in his medial meniscus. After a post-operative evaluation revealed that he was not healing properly, Mr. Chierchio began a series of plasma rich protein treatments. On July 10th, Mr. Chierchio will be reassessed by his surgeon to check the progress of his knee. The surgeon will then determine whether another procedure will be needed which will burn the nerves in the area. If the evaluation goes well and pain subsides, Mr. Chierchio can then start physical therapy for eight weeks in order to regain the use of his knee.

Due to Mr. Chierchio's high blood pressure and heart condition, Mr. Chierchio has also recently undergone a sleep study, the results of which will be available on June 5, 2023. After the results are available, he will be placed on a CPAP machine (which will take about three weeks to obtain) for three months to help alleviate the symptoms of sleep apnea and ensure proper breathing.

**II.     OFFENSE LEVEL CALCULATION**

Pursuant to a written plea agreement, on June 16, 2022, Mr. Chierchio pled guilty to one count of Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 371, which carries a maximum term of imprisonment of five years. Per the plea agreement, Mr. Chierchio's Guidelines range is 78 to 97 months' imprisonment, based on Criminal History Category III and the following offense level calculation:

**Base Offense Level**
((U.S.S.G. §2B1.1(a)(2)):                                                      6

Loss Amount

(more than $25,000,000 but not more than $65,000,000)

8

| | |
|---|---:|
| (U.S.S.G. §2B1.1(b)(1)(L)): | +22 |
| Two-Level Acceptance of Responsibility Reduction | |
| (U.S.S.G. § 3E1.1(a))[7]: | -2 |
| **Total Offense Level:** | **26** |

With six criminal history points and in Criminal History Category III, the Guidelines range for the above count is 78 to 97 months' imprisonment, or, upon motion from the government granting an additional one-point reduction under §3E1.1(b), 70 to 87 months' imprisonment. The applicable statutory maximum for the instant offense is 60 months' imprisonment.

### 1. Loss Amount

We respectfully note that since Mr. Chierchio's guilty plea, the loss amount has been calculated to an amount less than $25,000,000, which under U.S.S.G. §2B1.1(b)(1)(K), would add 20 points instead of 22, and thus, would place him at level 23 (Criminal History Category III) and in a Guidelines range of 57 to 71 months' imprisonment instead. We submit this is the proper Guidelines range, pursuant to the government's own loss calculation in its recent sentencing memorandum to the Court concerning co-defendant Jason Kurkland. Per the government's own memorandum, the "PPE Losses" were $19,500,000 and $2,025,000, totaling $21,525,000. *See* Government Sentencing Memorandum, dated May 15, 2023, at 25. Dkt. #286. As such, we respectfully request that such calculation is considered when calculating Mr. Chierchio's level and Guidelines range, in that the correct and appropriate range is 57 to 71 months'.

### 2. Criminal History

Secondly, we would be remiss not to note that the context of Mr. Chierchio's criminal

---

[7] Although the plea agreement does not specify an additional one point reduction pursuant to U.S.S.G. §3E1.1(b), the Pre-Sentence Report ("PSR") indicates that the government intends to make a motion stating it was notified in a timely manner of Mr. Chierchio's intention to plea guilty, and thus, the one-point reduction is warranted. *See* PSR at ¶ 77.

9

history points, which are based on only two convictions – a 2003 conviction for falsifying business records in Kings County for which he served his sentence and parole without issue, and a 2018 criminal tax fraud in the fourth degree conviction in Richmond County, for which he was sentenced to a conditional discharge. As the instant offense was committed during the conditional discharge period, two additional points were added to Mr. Chierchio's criminal history computation under U.S.S.G. § 4A1.1(d). While the defense concedes that the technical calculation of points is legally correct, we respectfully note that part of the calculation stems from a conviction from twenty years ago.

### III. A NON-GUIDELINES SENTENCE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, UNDER 18 U.S.C. § 3553(a)

In determining an appropriate sentence for Mr. Chierchio, the sentencing court is directed to "impose a sentence sufficient but not greater than necessary, to comply with . . . the need for the sentence to: (A) reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense, (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). The factors that must be considered by the Court when imposing a sentence according to 18 U.S.C. § 3553(a) are as follows:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed;

(3) the kinds of sentences available;

(4) the kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the U.S. Sentencing Guidelines;

(5) any pertinent policy statement;

10

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

**1. The Nature and Circumstances of the Offense**

Mr. Chierchio nor the defense intend to curtail the severity of offense. Without minimizing the severity of the same, we respectfully submit that the nature and circumstances of the offenses do not warrant a sentence of incarceration.

Firstly, the conduct, in and of itself, spanned approximately a four-month time period, between April and August of 2020. This relatively short time is not representative of his decades of conducting legitimate businesses. Secondly, Mr. Chierchio did not play a leading role in the offense, as indicated by the loss amount attributable to him in comparison to the amounts attributable to his co-defendants. Likewise, while the indictment sets forth multiple schemes conducted in the course of his co-defendants' involvement with the victims, Mr. Chierchio's involvement was limited to one financial deal and one identified victim – referred to as the "California PPE Deal," by which "Victim Two" invested their money into PPE that would be bought by the State of California. When the State wrongfully terminated the purchase order in or around May 1, 2020, and failed to remit payment for the goods produced by Mr. Chierchio, he took it upon himself to rent warehouses and store 80 million 3-ply masks and 7 million face shields. Mr. Chierchio did not permit anyone, such as his co-defendants, from taking any of the product from the warehouse. Due to market fluctuations concerning PPE, these products and Mr. Chierchio's inventory lost value to the point of near worthlessness.

As the Court is well aware, it is oftentimes difficult to quantify an appropriate sentence on the basis of monetary loss. While Mr. Chierchio pleaded guilty to a loss greater than $25,000,000.00 but less than $65,000,000.00, as discussed above, the loss amount by the

11

government's own concession is less than $25,000,000, reducing Mr. Chierchio's offense level accordingly – more than $9,500,000 but less than $25,000,000 adds 20 levels to his base offense level under U.S.S.G. §2B1.1(b)(1)(K). In any event, we submit that a broad range is not indicative of Mr. Chierchio's specific culpability and as such is not an accurate gauge when calculating the appropriate sentence. The loss specifically attributable to him is calculated on the basis that this represents the total amount received by Mr. Chierchio to invest in PPE. However, the entirety of this amount was not misappropriated – per the PSR, $10.15 million was used in connection to the PPE deal and for legitimate business purposes. The loss number also does not take into account other business expenses and losses that were accrued by Mr. Chierchio as he purchased and stored the PPE. Furthermore, the loss number also fails to take into account the amount of money that was seized upon indictment in this matter from Mr. Chierchio, approximately $8,000,000.

Lastly, the facts and circumstances surrounding Mr. Chierchio's subsequent actions indicate his swift acceptance of responsibility.

2. **The Need for the Sentence Imposed and Kinds of Sentences Available**

Mr. Chierchio is aware of the need for a sentence of some kind to be imposed. But we respectfully submit that the four goals of sentencing as enumerated under 18 U.S.C. § 3553(a)(2) – retribution, deterrence, incapacitation, and rehabilitation – can be met with a non-incarceration sentence. Mr. Chierchio is at a point in his life where the consequences of committing the instant offense are strongly felt – he is mature enough to recognize the error of his ways while also being young enough to potentially change the trajectory of his life. The loss of time spent with his daughters alone is a strong deterrent both individually and generally. In addition, the need to incapacitate and rehabilitate will just as likely be accomplished with minimal prison time and/or alternatives to incarceration such as home detention. Specific deterrence can and has been

substantially achieved through the restrictions imposed by supervised release as well as the consequences of having a federal felony conviction on one's record. *United States v. Francis*, 2013 U.S. Dist. LEXIS 138603, * 6 (E.D.N.Y. 2013) ("General deterrence is satisfied by the felony conviction and its collateral consequences").

   3. **Sentences of Similarly (and Dissimilarly) Situated Defendants**

Courts have imposed significantly below-Guidelines sentences in various cases where the fraudulent conduct was similar or much more significant than Mr. Chierchio's conduct in the instant offense. For example, in *United States v. Block,* No. 16-CR-595 (S.D.N.Y), the former Chief Financial Officer of a publicly traded real estate investment trust was convicted of being the mastermind of a fraud to manipulate the company's financial results by fraudulently inflating a key metric used by investors. The Court accepted the Government's calculation of roughly $300 million in shareholder loss and stated that the defendant had "brazenly" falsified key accounting numbers, but rejected the Government's proposed sentence of at least seven years' imprisonment and imposed 18 months.[8]

In *United States v. Cervino,* No. 15-CR-00171 (S.D.N.Y.), following his conviction at a three-week jury trial and a Guidelines range of 135 to 168 months' imprisonment, the defendant was sentenced to one year and a day for his role in a complex scheme to profit from the manipulation of the price of securities, through which the defendant received cash payments and large commissions while clients lost their entire investment.

In *United States v. Ng Lap Seng*, 15-CR-706 (VSB), the defendant received a sentence of 48 months, notwithstanding his guideline range of 235–293 months' imprisonment. Ng was a real

---

[8] http://www.investmentnews.com/article/20171108/FREE/171109929/brian-block-sentenced-to-18-months-in-prison

13

estate developer who paid more than $1 million in bribes to senior United Nations ambassadors in exchange for their endorsement of a prospective luxury real estate development project in Macau.

In *United States v. Dean Skelos,* 15-CR-317 (KMW), Skelos was the New York State Senate Majority Leader who leveraged his political position to obtain over $300,000, often in the form of commissions for his son, from companies seeking legislative endorsements and bidding advantages. received a sentence of 51 months, despite a Guidelines range of 151–188 months' imprisonment.

In *United States v. Louis Ciminelli*, 16-CR-776 (VEC), the defendant, the owner of a Buffalo construction company who rigged the bidding process for upstate development contracts by steering $750 million in contracts to his business and retaining $26.25 million as a management fee, was sentence to 28 months despite a Guidelines range of 108 to 135 months' imprisonment.

The above are just a few examples of courts substantially deviating from a Guidelines range in cases that are more significant in scope, loss amount, and individual culpability than the circumstances surrounding Mr. Chierchio's conduct.

### 4. Health Considerations and Prison Time in the Age of COVID-19

In terms of satisfying the goals of sentencing, but particularly that of punishment, we submit that any term of incarceration during the COVID-19 pandemic – which despite some news reports to the contrary, is still very much prevalent – should be considered. To the extent prison time can be quantified, to serve a sentence during COVID-19, while also suffering from health conditions, is inarguably more difficult than a prison term without a global pandemic. As the Honorable J. Paul Oetken held in sentencing the defendant in *United States v. Gonzalez,* 18-CR-669 (JPO) (S.D.N.Y.) to time served for conspiracy to distribute crack cocaine and heroin: "I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially

14

the equivalent of either time and a half or two times what would ordinarily be served…So I think having served 24 months is equivalent to having served three years."[9]

COVID-19 has drastically changed what it means to be incarcerated during COVID-19 and has led to sentencing variances and reductions since the beginning of the pandemic. *See United States v. Benitez*, No. 18-CR-390 (PAE), 2020 WL 4226590, at *3 (S.D.N.Y. July 23, 2020) (finding that defendant's asthma constituted an extraordinary and compelling reason for release); *United States v. Butler*, NO. 18-CR-834 (PAE), 2020 WL 4004175, at *2 (S.D.N.Y. July 15, 2020) (finding that defendant's asthma and obesity constituted an extraordinary and compelling reason for release); *United States v. Hernandez*, No. 18 Cr. 834-04 (PAE), 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020) (finding extraordinary and compelling reasons for release of inmate at high risk of serious illness from COVID-19 because of his asthma and acknowledging difficulties that high-risk inmate would face in caring for self if contracted COVID-19 in detention); *United States v. Park*, No. 16-CR-473, 2020 WL 1970603, at *1 (S.D.N.Y. Apr. 24, 2020) (granting release where defendant had CDC-identified risk factors, including asthma and a compromised immune system). *See also United v. DeShawn Smalls*, 19-CR-232 (VB). (sentenced to 36 months' imprisonment, below the suggested 70-87 month range, for a firearms offense when taking into account the harsh conditions at Westchester County Jail); *United States v. Abigail Baez,* 19-CR-271 (CS) (sentenced to a mandatory minimum of 60 months', below the 108-135 month range, for a drug offense).

Even without taking COVID-19 into consideration, studies have shown that incarceration reduces the average person's lifespan by up to two years per each year in prison. *The Dose-Response of Time Served in Prison on Mortality: New York State, 1989-2003,* Am. J. Pub. Health

---

[9] https://www.nydailynews.com/new-york/ny-mcc-mdc-hard-time-20210524-cwatz2asojglhm4cvjldbdx33e-story.html

103:3 (March 2013). "Incarceration not only compounds existing health issues and heightens the risk of future health problems, but – most alarmingly – has a deteriorating effect on the bodies of incarcerated people, causing them to physically age at a much faster rate than the public at large." *The High Cost of Low Risk: The Crisis of America's Aging Prison Population,"* The Osborne Association (2014).

It is guaranteed that any period of incarceration will disproportionately and adversely affect Mr. Chierchio's physical health. As receiving medical treatment has always been difficult within the confines of the Bureau of Prisons, COVID has made it exponentially more difficult. As discussed above, Mr. Chierchio has serious health conditions for which he is currently being treated. His medical needs such as plasma rich protein treatments, physical therapy, and sleep apnea machines, will be extremely difficult, and likely impossible, for the BOP to address.

## IV.     LETTERS OF SUPPORT FROM FAMILY AND FRIENDS

Mr. Chierchio has the support of his family, friends, and community, as evinced by the letters submitted on his behalf.

1.     Delton Cheng, a long-time friend of Mr. Chierchio, writes:

> I have known Chris for over 40 years, since Midwood High School in the early 80s. He is one of my dearest friends, a friendship with someone who can be relied on and depend on. His character, trustworthiness, integrity and giving heart is second to none.
>
> One crucial aspect to please consider is Chris Chierchio's remarkable dedication to philanthropy and his unwavering support for the needy and children.
>
> Over the past 13 years, I've been a part of The Danielle Antar Foundation. A foundation Chris has selflessly devoted his time and resources to, consistently demonstrating his commitment to helping the lives of others, specifically children. His actions positively impacted the community and brought hope to those less fortunate. Two boys and their families that I know personally; Justin Heilmann and Jake Lonigro were the recipients of Chris's Danielle Antar Foundation efforts and devotion.

Chris Chierchio is a devoted family man who deeply cherishes his loved ones. His commitment to his family's well-being is commendable and he has consistently shown himself to be a responsible and nurturing parent. The impact of a lengthy separation from his family would not only be felt by Chris but also by his children and those who rely on his love, support, and guidance.

I firmly believe that a shorter sentencing period would forward him the opportunity to further help his community, and continue his charitable efforts that have positively impacted countless lives and families.[10]

2. Jennifer Laforest, Mr. Chierchio's cousin, writes:

When I was 2 and my sister was 6, our father died by suicide. It devastated our mother, and home life was difficult to say the least. Chris was always a bright light, a happy and playful protector, our big cousin who always somehow made things feel alright. He was 10 years older than me, he didn't have to spend the time to make me feel cared for and special, but even as kids he did. His presence always made me feel safe and loved. He made us laugh, he played music for us, he challenged us, but most of all he was there. He didn't have to be - he just was.

As the years passed, and our mother continued to struggle financially - Chris was always there for his Aunt Ro. He gave her his car when he saw that hers was no longer safe to have on the road. He gave her a job, although she probably wasn't qualified for it, so she could put food on the table and pay rent. He gave her respect and told her he loved her.

We're used to believing it is our elders that support the kids in a family, but for Chris and our family, it was the other way around. When he saw my mother struggling, he was there to help, but most importantly, he showed her love and kindness. When our Uncle Carmel, a Vietnam-Veteran, was in recovery from severe drug addiction - Chris was there to help lift him and his family up. That is just who he is, and what he does for his friends and family - he wants to lift them up, to give them a shot at something a little better. What I love most about this in Chris, is that he does it without judgment. He never made my mom feel small, or less than, because she needed help. He just helped.

When I started college, and had no idea how to navigate filling out a FAFSA, or how to pay for college - Chris was there to help me get through my first year of college. I don't think I would have completed that first year without his help. I just knew I could count on him.

Chris has been a rock and positive influence for so many members of our family. He has certainly been an integral influence in lifting me, my sister and brother out of poverty and into fulfilling careers with loving families of our own. I know he

---

[10] *See* Exhibit G, Delton Cheng Letter.

doesn't understand what an impact he made on us, by just being there. By giving our mom a chance when no one would. It trickled
down. He has done this for so many. This is in his DNA.

My cousin has so much to offer his community and the kids, teens and adults around him. His mentorship and guidance elevates and opens up opportunities, not just monetarily, but in music, sports, dance and so much more. This is a person who gives everything he sets his mind to 100% and gives back 1000%. He is the hardest worker, the biggest talent and with an incredible heart.[11]

## CONCLUSION

For the foregoing reasons, we respectfully request that in consideration of the foregoing, a non-incarceration sentence would be appropriate and just in this case.

Dated: May 24, 2023
New York, NY

Respectfully submitted,

/s/
Gerald J. McMahon, Esq.
11 Burnham Court
Scotch Plains, NJ 07076
908-347-4670
gm@geraldjmcmahon.com

Thomas Harvey, Esq.
The Law Offices of
Thomas A Harvey, PLLC
9 Pheasant Rd West
Pound Ridge, NY 10576
(212) 972-8935
taharvey28@aol.com

Anjelica Cappellino, Esq.
22 Powers Street
Brooklyn, NY 11211
(917) 440-3715
acappellinoesq@gmail.com

---

[11] *See* Exhibit H, Jennifer Laforest Letter.